[No. 25208-9-I. Division One. January 13, 1992.]

DOUGLAS NORTHWEST, INC., ET AL, *Appellants*, v. BILL
O'BRIEN & SONS CONSTRUCTION, INC.,
*Respondent*, MERTON GRIBBLE,
ET AL, *Appellants*.

*Richard L. Lambe, Aaron Hicks,* and *Ulin & Lambe P.S.*; *John H. Bright* and *Keller Rohrback,* for appellants.

*Alan B. Bornstein, Bruce P. Babbitt,* and *Ferguson & Burdell,* for respondent.

SCHOLFIELD, J. — Douglas Whitley and his company, Douglas Northwest, Inc., appeal an adverse decision following a bench trial in their action to set aside a lien placed on their construction project by Bill O'Brien & Sons Construction, Inc. We affirm in part and reverse in part.

FACTS

1. Parties.

This case arose from a series of disputes between the parties involved in the construction of Admiralty Terrace, a residential apartment complex located in south Snohomish County. The parties bringing this appeal are (1) Douglas Northwest, Inc., a Washington corporation that was the original general contractor for the project; (2) Douglas Northwest's principal, Douglas Whitley, who owned the Admiralty Terrace site during the period of construction; (3) Merton Gribble, chief executive officer of Douglas Northwest and construction manager for the Admiralty Terrace project; (4) Gribble's putative wife, Nancy Gribble; (5) King William Associates, a Washington general partnership that currently owns the Admiralty Terrace project; and (6) Donald and Jane Doe Winton, and their marital community, as managing partner of King William Associates.

The respondent in this action is Bill O'Brien & Sons Construction, Inc. (hereinafter O'Brien), defendant below, a Washington corporation, whose president and principal is William O'Brien.[1] O'Brien was a subcontractor on the Admiralty Terrace construction project.

2. Background.

An examination of the ownership history of the Admiralty Terrace site, as well as past efforts to develop it, is important in resolving the issues raised in this appeal. Prior to October 29, 1984, the Admiralty Terrace site was owned by a group known as the N.A.N. Partners, a general partnership in which Merton Gribble was a principal. In 1979, the N.A.N. Partners had attempted to develop the property for condominiums. To this end, the partners applied for building permits with Snohomish County in 1979 and commissioned a soils report for the property in 1980. After an environmental review of the project, Snohomish County required that several conditions be met before building

---

[1]William O'Brien is not a party in this case. The name "O'Brien" is used throughout this opinion interchangeably to refer to either William O'Brien or Bill O'Brien & Sons Construction, Inc., as appropriate.

permits would be issued. The N.A.N. Partners appealed the imposition of these conditions, but were not successful.

Many of the conditions remained unsatisfied as of September 1984, when Gribble requested Western Surveyors, Inc., to prepare engineering and design work plans for the Admiralty Terrace site. These plans were submitted to Snohomish County by Western Surveyors on October 5, 1984. Although a soils report had been completed for the property in 1980, it was not mentioned in any of the plans submitted by Western Surveyors.

On October 29, 1984, Douglas Whitley, principal of Douglas Northwest, Inc., executed a joint venture agreement with Gribble for the development and sale of the Admiralty Terrace site. Under the agreement, Whitley purchased the site from the N.A.N. Partners and agreed to operate as the general contractor for the development of Admiralty Terrace, a $6 million residential apartment project to be located on the site. The agreement provided that Whitley would be the owner of the Admiralty Terrace project, with Gribble being responsible for managing and overseeing its development.

William O'Brien, principal owner of Bill O'Brien & Sons Construction, Inc., learned of the Admiralty Terrace project in November 1984. Prior to submitting a bid for the project, O'Brien met with Gribble, briefly looked over the plans, and accompanied him to the Admiralty Terrace site. While at the site, O'Brien asked Gribble if there was a soils report on the job, and Gribble said " 'No.' . . . 'I am the soils report.' " Gribble told O'Brien that he had owned the property for a number of years and that the ground on the site was excellent. Gribble stated that he had cleared the site and done some grading work on it, and that all the soil on the site was good material.

3. Grading Contract.

Construction work to develop the Admiralty Terrace project involved two areas. The first was the "on site" area comprised of land owned by Douglas Whitley and upon

which the project was to be built. The second area was the adjoining unimproved county right of way.

Using the engineering and design plans prepared by Western Surveyors, O'Brien began to prepare a bid for the project.[2] O'Brien originally included in the bid a contingency for costs associated with bringing imported materials onto the site. Gribble, however, wanted reductions in the bid price, so O'Brien removed cost calculations for any use of imported materials. Gribble told O'Brien that all soil on the site was good material, and that only on-site material was to be used in the project.

In their negotiations, Gribble emphasized that if O'Brien were awarded the contract, he must begin work immediately, preferably prior to the beginning of 1985. O'Brien was given no indication that his access to the site would be restricted or that drawings for the project needed further approval by the regulatory agencies; in fact, O'Brien testified that Gribble indicated the opposite to be true. In preparing his bid, O'Brien assumed the entire Admiralty Terrace site would be made available.

On December 20, 1984, O'Brien entered into a sub-contractor's agreement with Douglas Northwest to perform all clearing, grubbing, grading, compaction, retention pond, guardrail and storm drainage work on the project. The written contract was supplied by Gribble on behalf of Douglas Northwest and stated a contract price of $124,000. Because a payment and performance bond was required on the project by Douglas Northwest, O'Brien submitted the contract to its bonding company. The bonding company would not issue a bond based upon the contract, however, and insisted instead that an AIA[3] contract form be used that better protected the rights of O'Brien and the bonding com-

---

[2] As previously indicated, the plans prepared by project engineer Western Surveyors made no mention of the soils report. In fact, although the report had been originally delivered to Western Surveyors by Merton Gribble, Gribble took it back sometime during the period November-December 1984.

[3] AIA is an acronym for American Institute of Architects. Plaintiff's exhibit 6.

pany. Pursuant to this request, the AIA subcontract for the clearing, grubbing and storm sewer work (grading contract) was substituted for and superseded the previous contract between the parties. Like the original agreement, the AIA contract is dated December 20, 1984, although it was signed later in 1985. The AIA grading contract called for a start work date of January 2, 1985, and a completion date as soon as possible, but not later than 80 workdays. Although the original contract had been silent on which party was obligated to obtain necessary permits, the AIA contract contained a standard preprinted clause providing that "[t]he Subcontractor shall secure and pay for all permits, fees and licenses necessary for the execution of the Work described in the Contract Documents as applicable to this Subcontract." Exhibit 6, art. 11, ¶ 11.17, in part.

4. Sewer and Water Utilities Contract.

O'Brien also submitted a bid to Douglas Northwest for the installation of sewer and water utilities on the project. O'Brien's bid was accepted, and by agreement dated February 21, 1985,[4] O'Brien and Douglas Northwest executed a subcontract for the performance of sewer and water work. This contract was on a form supplied by Gribble and required O'Brien to obtain a performance and payment bond. As with the grading contract, however, no bond would issue on Gribble's form. The bonding agents again insisted that an AIA subcontract be used to better protect O'Brien's and the bonding company's rights. The AIA subcontract (utilities contract) for the sewer and water work was substituted for and superseded the previous subcontract agreement between the parties. The contract was dated March 6, 1985, and called for a start work date of March 15, 1985; the work was to be completed as soon as possible, but not later than 60 working days. The contract price for O'Brien's completion of the work was $200,000.

---

[4]The trial court's revised findings of fact give the date of execution of this agreement as "February 21, 1984". The year is incorrect. The contract is actually dated 1985.

## 5. Plan Approval and Commencement of Work.

Due primarily to Gribble's request that O'Brien be on site and working prior to the end of 1984, O'Brien's forces commenced work clearing and grubbing the site on December 22, before the actual contract start work date. At the time O'Brien began working, all necessary plans for the project had not been approved. Several items, as set out in the environmental impact statement and permit applications dating from the N.A.N. Partners' ownership of the project, remained unsatisfied as of January 1985.[5] Furthermore, plan approvals for performing work within the county right of way had not been issued, and the requisite agreements had not been reached with adjoining property owners. The uncontested finding of the trial court is that these agreements were within the sole control of Gribble and Whitley.

During the second week of January 1985, work on the project was slowed by incomplete and late surveying. On January 22, O'Brien was informed by Snohomish County officials that no dirt on the site could be moved due to the lack of permits. O'Brien spoke with Gribble about the permits, and Gribble informed him that he had talked with the County and that work could proceed in the retention pond area. Gribble further told O'Brien that he felt he would have the necessary permits within 2 days, but this was not accomplished.

Also in January, O'Brien attempted to utilize on-site soils to fill and compact the detention pond and road embank-

---

[5]In a letter dated January 25, 1985, and addressed to Dale Gribble (Mert Gribble's son), the Snohomish County Department of Planning and Community Development listed several items to be completed before a grading permit would be issued for the site:

(A) Provide a copy of a Hydraulics Project Approval (HPA) from the Washington State Departments of Fisheries and Game;

(B) Receive approval of Stream Reclamation Plan(s) (including landscaping) from WSDOF/WSDOG (Washington State Department of Fisheries and Washington State Department of Game) and Snohomish County Public Works Department (DPW);

(C) Receive approval of Temporary Erosion Control and Sedimentation Plan (TECSP) from DPW.

Exhibit 35.

ment areas. The soils were overly moist, however, and had to be dug out and replaced. The embankment was redone in March, but compaction tests indicated that the native soils contained excess moisture and would not compact to the levels required by the specifications. It was not until the late spring of 1985 that, on the third attempt, O'Brien managed to attain the proper compaction levels in these areas.

Due to the lack of a grading permit, little if any earthwork was performed during the first half of February. By February 15, 1985, the County partially approved plan sheets prepared by project engineer Western Surveyors for grading and temporary erosion and sedimentation control (TESC) work. A grading permit, based on the limited plan approval, was issued on February 15 and limited grading and TESC work to the on-site area.

The job was again stopped on March 6, 1985, with the County informing O'Brien that because right of way plans had not yet been approved, no dirt could be moved. From March 8 through March 20, there was no substantial work done on the project due to the lack of plan approval. During this time frame, the parties also executed an addendum to the grading contract changing the starting date from January 2, 1985, to March 8, 1985.

On March 8, 1985, by resolution of its directors, Douglas Northwest, Inc., was dropped as the general contractor for the Admiralty Terrace project and replaced by Douglas Whitley, who succeeded to all rights and obligations of Douglas Northwest, Inc.

Although work on the utilities contract was scheduled to commence on March 15, 1985, the Alderwood Water District would not allow sewer and water utility installation to proceed until April 3, 1985. The work was largely restricted to on-site access, and plans for work within the county right of way were not approved until April 30, 1985. Douglas Northwest's plans for the storm drainage system, both on site and within the county right of way, were not approved by the County until May 23, 1985.

While talking with an employee of another subcontractor in the summer of 1985, O'Brien first learned that a soils report had been prepared for the site. O'Brien asked Gribble about the report, but Gribble stated that he was unaware of it. O'Brien ultimately went to the offices of Douglas Northwest and was provided with a copy of the report by one of the secretaries. The report, a 30-page document prepared for the N.A.N. Partners in May 1980 by Earth Consultants, Inc., indicated that the site contained fine-grained soils that would make grading operations difficult in wet weather. The report also indicated that the excessive amount of "fines"[6] present in the soil would make compaction difficult when the soil was wet.

O'Brien did not substantially complete the work under the grading contract until August 28, 1985, and did not substantially complete the utilities contract work until September 12, 1985. This constituted a delay of 51 calendar days on the grading contract and 97 calendar days on the utilities contract.

The trial court made a series of findings, uncontested by appellants, as to the effect of the plan approval delays on O'Brien:

> Delays of plan approvals on water, sewer and the grading and storm drainage contract items impacted each other because it destroyed the construction schedule and logic planned by O'Brien Construction.

Revised finding of fact 38.

> Delays of plan approvals on water, sewer and the grading and storm drainage contract items impacted each other because storm sewer and water had to be placed at various depths in the rights of way.

Revised finding of fact 39.

> Admiralty Terrace was only able to get partial access for site grading by February 15, 1985, and was not able to get a grading permit for Admiralty Way [county right of way] until

---

[6]In its findings, the trial court indicated that "fines" are small particles of materials that turn muddy and plastic and retain moisture when wet.

the end of April 1985, and was not able to get final drainage plan approval until the 23rd of May 1985.

Revised finding of fact 40.

These delays in grading and drainage plan approvals caused no critical path progress to be made during the original time span of the storm sewer, clearing, grubbing and contract grading work and a delay of 65 calendar days to March 8, 1985, subjected O'Brien to extended overhead, extended supervision, labor inefficiencies, equipment inefficiencies and stand-by equipment.

Revised finding of fact 41. The trial court further found that Whitley and Gribble were aware of the delays and the effect of such delays on O'Brien's work, and that O'Brien had initially informed them orally, and later in writing, of the cost impacts.

O'Brien's work schedule was also extended due to unplanned work activities. O'Brien had to redo fills placed in the road embankment and detention pond areas, clean up earthwork placed by other subcontractors over its work, and perform a variety of other tasks not covered by the contract. The trial court found that, but for these additional work impacts and other disruptions, O'Brien could and should have completed work on the contracts on or about July 9, 1985. O'Brien was damaged, the court found, by the failure of Whitley and Gribble to properly schedule or coordinate the work.

6. Settlement Meeting of October 3, 1985.

By October 1985, the project had been substantially completed for nearly 1 month. Although the revised contract amount was over $344,000 on both contracts, O'Brien had only been paid $283,000. O'Brien had not been paid for his work since July 1985, and Gribble and Whitley had taken unauthorized and unexplained downward revisions of change orders. By September 10, 1985, O'Brien contends that $72,960.90 was owing on both contracts, and it is undisputed that Gribble and Whitley were in breach of their payment obligations at that time.

On October 3, 1985, a meeting was held in Whitley's office between Whitley, Gribble, and Bill and Nancy O'Brien. The

purpose of the meeting, the O'Briens believed, was to obtain payments from Whitley so that O'Brien's suppliers could be paid. Whitley testified, however, that he believed that the meeting was being held to discuss a series of back charges being assessed against O'Brien. Gribble had presented O'Brien with these back charges, totaling over $30,000, a few days earlier.

During the discussions, Nancy O'Brien gave Gribble a list of invoices from O'Brien suppliers. At the close of the meeting, a total of seven checks, each drawn on Whitley's account, were given to O'Brien. Five of the checks were joint checks made payable to both O'Brien and one of O'Brien's suppliers; the other two checks were made payable only to an O'Brien supplier. The amount of each individual check either matched or was somewhat less than the amount of each supplier invoice.[7] Each check was stamped on the back with the following "waiver":

The named Payee, by endorsement hereof does
1 Relinquish and release all lien rights for labor and/or material represented by the invoice or order for payment represented by this draft, against the identified real property, the Payor, Owner, Contractor and Mortgagee.
2 Represent for purpose of securing this payment:
 a. That all materialmen and/or labor for this work have been paid or will be paid from the proceeds hereof.
 b. That said material and/or labor was actually furnished for the exclusive benefit of said property.
3 Consent to being named as a joint payee with any other payee joined on the reverse[.]

Exhibit 27. In addition to the above stamp, five of the checks contained handwritten notations on the top stating "[e]ndorsement hereon is payment in full." Exhibit 27. O'Brien and his joint payees ultimately endorsed all of the joint checks.

After the October meeting, O'Brien submitted no further billings to Whitley or Douglas Northwest for approximately 7 months. On November 1, 1985, however, Gribble issued

---

[7]The total of the checks was $30,578.30, and the total of the invoices was $32,041. Four of the seven checks precisely matched the amount of a corresponding supplier invoice.

O'Brien a check in the amount of $13,117.38 to pay an invoice from Material Distributors, an O'Brien supplier. In January of 1986, Whitley issued O'Brien another check for $19,131.11 for sales taxes, and in February of that year an arbitrator awarded O'Brien $4,500 for certain "punchlist" work performed in August-September of 1985. Whitley and Gribble refused to pay on the arbitrator's award and refused thereafter to arbitrate any other disputed punchlist items.

7. Procedural History.

In May 1986, O'Brien filed a lien for $150,000 against the project. O'Brien later increased the amount requested under the lien to $246,094.91, plus reasonable attorney's fees and costs. In June of 1986, Douglas Northwest commenced this action to set aside the lien. O'Brien counterclaimed under theories of breach of contract and lien foreclosure, as well as other theories not relevant to this appeal. O'Brien sought to recover (1) the unpaid contract balance, (2) compensation for additional work performed, (3) compensation for the increased costs attributable to misrepresentation of the soils on the site, and (4) compensation for standby equipment, extended home office overhead, extended field operation costs, and labor and equipment inefficiency.

A bench trial began on June 20, 1989. On September 27, 1989, the trial court entered findings of fact and conclusions of law,[8] and subsequently entered judgment for O'Brien in the amount of $324,481.17 against the following parties, jointly and severally: Douglas Northwest, Inc., Douglas Whitley, and Merton and Nancy Gribble, husband and wife. The court ordered $282,400.92 of the judgment to be joint and several as against the current owners of the Admiralty Terrace project, third party defendants King William Associates, and its managing partner, Don Winton.

Appellants Douglas Northwest, Inc., Merton Gribble, Nancy Gribble and Douglas Whitley (hereinafter DNW)[9]

_____

[8]On January 9, 1991, the court entered revised findings of fact and conclusions of law pursuant to a stipulation between the parties.

[9]These appellants will be collectively referred to as DNW when discussing the common issues they raise in this appeal.

raise several issues in this appeal. DNW contends that the trial court erred in: (1) awarding O'Brien damages attributable to permit delays, (2) awarding damages based on O'Brien's soils misrepresentation claim, (3) allowing O'Brien to recover on a quantum meruit basis for labor and equipment inefficiency, (4) finding that no accord and satisfaction was reached between the parties, (5) entering judgment individually against Nancy Gribble, and (6) awarding O'Brien attorney's fees.

Appellants Don Winton and King William Associates (hereinafter Winton) raise two issues in this appeal. Winton contends that the trial court erred in entering judgment against him because the court made no finding of fact in support of his liability. Winton further argues that an award of prejudgment interest on several of O'Brien's claims was improper because the claims were not liquidated.

## PERMIT DELAYS

The court awarded O'Brien a total of $20,525.58 in damages for standby equipment and work interruptions that occurred during the months of January, February and March 1985. The court also awarded O'Brien amounts for additional home office overhead, additional field office supervision, and labor and equipment inefficiency.

DNW asserts that these damages were attributable to delays in acquiring the necessary permits. DNW argues that O'Brien was contractually obligated to obtain all permits necessary for its work, and thus cannot recover any damages which resulted from its failure to fulfill this duty. In the alternative, DNW contends that O'Brien cannot recover costs incurred prior to the contractual starting date.

Both contracts provided that the subcontractor, O'Brien, was to obtain necessary permits:

> 11.17 . . . The Subcontractor shall secure and pay for all permits, fees and licenses necessary for the execution of the Work described in the Contract Documents as applicable to this Subcontract.

Exhibits 6, 11, art. 11. The trial court acknowledged this provision, but found that it was not controlling:

O'Brien, by the later AIA contracts, was obligated to obtain necessary permits for its scope of work. The only permit required to be issued for O'Brien Construction's scope of work was a grading permit. Merton Gribble, however, testified that he and Douglas Whitley did not rely on O'Brien to obtain any permit or plan approval, and, in fact, delays in issuance of the grading permits, and plan approvals, were caused by reasons within Merton Gribble's and Douglas Whitley's control, not O'Brien's.

Revised finding of fact 27.

There is substantial evidence that Gribble and Whitley never relied on O'Brien to secure the permits and instead undertook such obligations themselves. Gribble initiated plan approval measures before the contract with O'Brien was even signed. It was DNW's project engineer, Western Surveyors, that submitted plans for site grading, storm drainage and pavement, and temporary erosion to Snohomish County in October 1984. Gribble and/or Whitley were the named applicants on all correspondence with Snohomish County on permit issues.[10]

The documentary evidence is consistent with O'Brien's testimony on this question. Prior to the contract starting date, O'Brien testified, Gribble had indicated that all project drawings had been approved and that access to the site would be unrestricted. When the project was delayed due to lack of permits in January 1985, Gribble assured O'Brien that he would acquire the permits. Gribble and Whitley were solely responsible for reaching agreements with adjoining landowners so that right of way work could proceed.

■ DNW never mentioned, relied upon, or sought to enforce paragraph 11.17 of the contract during the course of O'Brien's performance. To the contrary, DNW gave O'Brien every indication that it would take care of permit issues, and

---

[10]Among the items required for a grading permit were Hydraulics Project Approval (HPA) and revised Temporary Erosion and Sedimentation Control (TESC) plans. Whitley was the named applicant for the HPA, and project engineer Western Surveyors had submitted all plans for grading and TESC work. The partial grading permit of February 15, 1985, was issued in the name of Douglas Northwest, Inc., not O'Brien.

this is in fact what occurred. DNW cannot now assert a breach because paragraph 11.17 was not performed according to its letter.[11]

As an alternative argument, DNW contends that O'Brien cannot recover damages for costs incurred prior to the contractual starting date. DNW ordered O'Brien to commence clearing and grubbing the Admiralty Terrace site on December 22, 1984, prior to the initial contractual starting date of January 2, 1985. O'Brien thereafter worked on the project for about 2½ months before executing the addendum that DNW contends moved the starting date to March 8, 1985.

The addendum, signed by O'Brien and Gribble sometime in March 1985, provided as follows:

> This addendum is for a contract dated December 20, 1984 between Douglas W. Whitley, owner and Bill O'Brien & Sons Construction, subcontractor.
> Article #3, the starting date January 2, 1985 shall be ammended [sic] to read March 8, 1985. Article #7, the starting date of January 2, 1985 shall be ammended [sic] to read March 8, 1985.

Exhibit 7. Two of the trial court's findings pertain to this issue:

> Contract #1 called for a start work date of January 2, 1985, and a completion as soon as possible but not later than 80 workdays.

Revised finding of fact 24.

> The revised contract completion date on Contract No. 1 was from March 8 to July 8, 1985. . . .

Revised finding of fact 49(b).

The trial court made no finding addressing the effect of the addendum on O'Brien's right to payment for work per-

---

[11]*See Evans v. Laurin*, 70 Wn.2d 72, 76, 422 P.2d 319 (1966) (where one party performs under contract, and other party accepts that performance without objection, it is assumed that such performance was the performance contemplated by the contract); *Jackson v. Nangle*, 677 P.2d 242, 249 (Alaska 1984) (if parties to contract adopt by conduct a mode of performance differing from its strict terms, neither party can assert a breach because contract was not performed according to its letter).

formed prior to March 8, 1985. O'Brien asserts that DNW never raised this issue at trial, and we are inclined to agree. Although there was testimony by Gribble that the addendum was intended to operate as an extension of time,[12] there was no argument that O'Brien should be denied compensation for work performed prior to the amended starting date.

In any event, DNW's argument on this issue is simply unsupported by the facts. There is no evidence that the addendum was intended to preclude O'Brien from receiving compensation for work performed prior to March 8, 1985. O'Brien had been working on the site for nearly 2½ months before the addendum was signed. Not only was this work requested by DNW, but DNW paid O'Brien over $58,000 for performing it. DNW has never disputed that O'Brien was entitled to these sums.

### MISREPRESENTATION OF SOILS CONDITIONS

The trial court found that Gribble had represented to O'Brien that the soils on the site were all good materials suitable for grading, filling and other construction work to be performed by O'Brien in the winter of 1984-85. The court further found that Gribble had instructed O'Brien to use only native soils on the project and had told him that there was no soils report for the site. The soils report, the court stated, was a material document that identified the unsuitability of the soils with which O'Brien was to be working.

By not fully apprising O'Brien of the nature of the soils on the site and the existence of the soils report, the court found that Gribble, Whitley and Douglas Northwest had misrepresented the soil conditions and willfully withheld material information of which they had superior knowledge.

---

[12]When questioned about the purpose of the addendum, Gribble testified: "Well, I believe Bill O'Brien brought this.[addendum] to me and asked for an extension of time, and his reasonings behind the thing, he asked me if I'd give him an extension of time and I said yes, . . . and I felt it was only a fair thing to do to give Bill some additional time over and above what the contract stated."

The court found that O'Brien was required to fill and compact the unsuitable soils two extra times, incurring excess manpower and equipment costs of $20,183.95. This amount, the trial court found, was due and owing O'Brien from June 1, 1985.

DNW first asserts that because the contract contained no clause relieving O'Brien of unanticipated soil conditions, O'Brien had the burden of proving each element of fraud by clear, cogent and convincing evidence. DNW argues that O'Brien did not prove that Gribble misrepresented the soil conditions, and further did not demonstrate that he had a right to rely on an assumption that the soils were suitable.

■ ■ One claiming misrepresentation must prove nine elements: (1) representation of an existing fact; (2) materiality; (3) falsity; (4) speaker's knowledge of its falsity; (5) speaker's intention that it shall be acted upon by the plaintiff; (6) plaintiff's ignorance of falsity; (7) reliance; (8) right to rely; and (9) damages. *Hoffer v. State*, 110 Wn.2d 415, 425, 755 P.2d 781 (1988), *aff'd on rehearing*, 113 Wn.2d 148, 776 P.2d 963 (1989). Each element of fraud is a material issue to be resolved and must be proven by clear, cogent and convincing evidence, *Howell v. Kraft*, 10 Wn. App. 266, 271, 517 P.2d 203 (1973), which is the equivalent of saying that the ultimate fact in issue must be shown to be "highly probable". *In re Sego*, 82 Wn.2d 736, 739, 513 P.2d 831 (1973). The standard of review on appeal is whether there is substantial evidence to support the findings in light of the "highly probable" test. *In re Estate of Eubank*, 50 Wn. App. 611, 618, 749 P.2d 691 (1988).

DNW argues that Gribble's statement that the on-site soil was all good for winter excavation was not false, and that O'Brien admitted during trial that good soils were present. O'Brien's testimony on this issue was based on information contained in the soils report. The report, O'Brien testified, indicated that out of the 32 test borings conducted on the site, two revealed the presence of suitable soils. O'Brien further testified that, with the information contained in the

soils report, he could have successfully built a particular road on the project just once and it would have worked.

In our opinion, the fact that a fraction of the on-site materials were suitable does nothing to detract from the overall falsity of Gribble's representations. Gribble stated that the on-site materials were *all* good for the work to be performed, that the ground was excellent, and that no problems would be encountered. Gribble's statements amounted to an assurance that the entire site contained soils suitable for O'Brien's work. Such representations varied materially from the true conditions and from the results of the soils report, which indicated that only a small percentage of the soil could be worked with in wet conditions.

DNW next contends that O'Brien did not demonstrate that he had a right to rely on Gribble's representations as to soil quality. DNW contends that O'Brien had previously worked with glacial till and knew that such soils were present in south Snohomish County, but made no effort to conduct even a cursory sampling of the soil on the site. DNW presented several witnesses who stated that glacial till was quite common in the area. DNW thus contends that O'Brien's assumptions as to the quality of the soil in the area were not justifiable, and that he did not have a right to rely on Gribble's representations.

We disagree. While O'Brien may have had general knowledge of the soil conditions in south Snohomish County, this does not mean he had reason to know of the soil composition of a particular site. Local soil conditions in the area may well vary, as DNW's expert conceded. Nor was O'Brien required to conduct independent tests to confirm the validity of Gribble's representations. A party to whom a positive, distinct and definite representation has been made is entitled to rely on that representation and need not make further inquiry concerning the particular facts involved. *See, e.g., Rummer v. Throop*, 38 Wn.2d 624, 633-34, 231 P.2d 313 (1951) (plaintiff, despite having heard rumors to

contrary, had right to rely on seller's representation that presence of magnesium dust on farm would not affect crops); *Jenness v. Moses Lk. Dev. Co.*, 39 Wn.2d 151, 158, 234 P.2d 865 (1951) (plaintiffs entitled to rely on tavern seller's representations as to net profit of business where facts peculiarly within speaker's knowledge); *North Pac. Plywood, Inc. v. Access Rd. Builders, Inc.*, 29 Wn. App. 228, 628 P.2d 482 (contract assignee had right to rely on assignor's representation as to type of road to be built although assignee did not check publicly available specifications), *review denied*, 96 Wn.2d 1002 (1981).

The court's analysis in *North Pac. Plywood* is instructive. In that case, Walch Logging accepted assignment of a United States Forest Service road building contract from Access Road Builders. *North Pac. Plywood*, at 230. Prior to the assignment, and in response to his specific inquiry, Mike Walch, Walch Logging's president, was told by Access general manager John Maestas that the road to be built was an " 'old style' " road. *North Pac. Plywood*, at 230. Walch asked Maestas for the plan and profile, a component of the specifications, but was not provided with these documents until after the contract was assigned. *North Pac. Plywood*, at 233. After discovering that he had in fact contracted to construct a considerably more expensive " 'new style' " road, Walch asserted a claim against Access for fraud. *North Pac. Plywood*, at 231.

Among the defenses raised by Access was that Walch had no right to rely on the representation of Maestas because Walch could have examined the publicly available project specifications. *North Pac. Plywood*, at 233. The court rejected this argument. Since Walch was told that the road was to be of old style construction and had not received the plans he had requested, he had a right to rely on the representations of Maestas and had no duty to investigate further. *North Pac. Plywood*, at 233.

The present case is quite similar to *North Pac. Plywood*. Before O'Brien submitted his bid, Gribble told him that the

on-site materials were suitable for the work to be performed and that no imported fill was to be used. In response to O'Brien's specific inquiry, Gribble stated that there was no soils report for the site. Having been told the soils were suitable and that there was no soils report, O'Brien was entitled to rely on Gribble's representations in entering the contract and had no duty to investigate further.

The trial court's findings do not include a specific finding that O'Brien had a right to rely and did rely on Gribble's representations.

The evidence on this issue is clearly sufficient to support findings of a right to rely and reliance in fact. It is implicit from the findings entered by the trial court that it did find both a right to rely and actual reliance. Revised finding of fact 9 sets forth in detail the misrepresentations of Gribble relating to the soil conditions and the circumstances under which the misrepresentations were made. Revised finding of fact 9 states in part:

> That this was a material misrepresentation by Gribble which caused O'Brien to act on this alleged fact to his detriment.

The foregoing can reasonably be interpreted as a finding by the trial court of justifiable reliance on the misrepresentation.

In revised finding of fact 12, the trial court refers again to the soils report and found that the failure to make it known to O'Brien amounted to a willful withholding of material information. The award of substantial damages arising from delays and additional work required because the native soils were unsuitable and made it necessary to import soil from other areas onto the property implicitly involves a finding of reliance on the misrepresentation. See revised findings of fact 61, 66. This was a bench trial, and the trial court is presumed to know the law. Under these circumstances, it is clear that the failure to include a specific finding on reliance and the right to rely on Gribble's misrepresentations is due to inadvertent oversight and was not intentional.

Relying on *Smith v. King*, 106 Wn.2d 443, 722 P.2d 796 (1986), DNW contends that because the trial court made no express finding as to O'Brien's right to rely on Gribble's representations, the result is a presumption of a negative finding against the party with the burden of proof.

■ This common law rule must be selectively applied. It should not be determinative on a material issue where the record shows, as it does in this case, that there is ample evidence to support the missing finding, and the findings entered by the court, viewed as a whole, demonstrate that the absence of the specific finding was not intentional.

It is common practice for the attorney for the prevailing party to prepare findings of fact, conclusions of law and a form of judgment and to present them to the trial court for approval and signature. The trial court often signs findings of fact and conclusions of law several weeks after the termination of the trial. If a material finding is not made, it may be due to inadvertence by the lawyer preparing the findings. In the absence of some indication in the record that the failure to make a specific finding was intentional, it is unrealistic to treat the absence of a finding as the equivalent of a negative finding on the issue. For example in *Smith v. King, supra* at 451, the Supreme Court, in applying the rule, noted that the court's review of the record demonstrates that no evidence was presented on the issue involved. Under such circumstances, a negative finding is appropriate.

In this case, the evidence in the case, the findings that were made, and the result of the trial are all consistent with the conclusion that the failure to enter specific findings on reliance and the right to rely was unintentional. Therefore, we decline to treat the absence of a finding on the reliance issues as the presumptive equivalent of a negative finding on those issues and hold that under the circumstances of this case, the absence of the findings is harmless error. *See Fisher Properties, Inc. v. Arden-Mayfair, Inc.*, 115 Wn.2d 364, 371, 798 P.2d 799 (1990).

QUANTUM MERUIT

DNW next contends that the trial court erred in awarding O'Brien $40,000 on a quantum meruit basis for labor and equipment inefficiency. DNW contends that quantum meruit was an improper basis for recovery in this case because the contract provided for O'Brien's claims.

■ The term "quantum meruit" literally means " 'as much as deserved' ". *Bignold v. King Cy.*, 65 Wn.2d 817, 826, 399 P.2d 611 (1965) (quoting *Losli v. Foster*, 37 Wn.2d 220, 233, 222 P.2d 824 (1950)). It is not a legal obligation like contract or quasi-contract, but rather, is a remedy — " 'a reasonable amount for work done.' " *Eaton v. Engelcke Mfg., Inc.*, 37 Wn. App. 677, 680, 681 P.2d 1312 (1984) (quoting *Heaton v. Imus*, 93 Wn.2d 249, 252, 608 P.2d 631 (1980)). A claim in quantum meruit is properly dismissed as a matter of law where that same claim is covered by specific remedial provisions under the contract. *See Hensel Phelps Constr. Co. v. King Cy.*, 57 Wn. App. 170, 183, 787 P.2d 58 (1990).

Paragraph 11.4 of both AIA subcontracts provides that "[t]he Subcontractor shall make all claims promptly to the Contractor for additional work, extensions of time, and damage for delays or otherwise, in accordance with the Contract Documents." Exhibits 6, 11. Notwithstanding this provision, the trial court found that quantum meruit relief was appropriate:

> The efficiency of O'Brien's crews and equipment was impacted by many interruptions, interferences and delays caused by the owner's failure to deliver complete site access, the owner's delay in obtaining plat approval and satisfying EIS requirements, casualties to O'Brien's work, shutdowns, stop work orders, and other costs for which O'Brien was not responsible. These events caused O'Brien's total manhours on the project to double from that reasonably estimated. After adjusting for extended supervision and claims for which direct claim items are awarded, O'Brien suffered total labor and equipment impact inefficiency of $40,000.

Revised finding of fact 62. The trial court further found that O'Brien had first orally notified Whitley and Gribble of the

delay-caused cost impacts, and that written notice was later provided.

DNW argues that under *Hensel Phelps*, quantum meruit relief in this case is inappropriate because the contract provided a remedy for O'Brien's claim. DNW contends that O'Brien's claim is provided for under paragraph 11.4, as well as paragraphs 11.13, 11.14 and 11.15.

O'Brien's labor and equipment inefficiency claim falls within the category of "damage for delays or otherwise" under paragraph 11.4. That provision requires only that a "claim" be made for the contingencies listed and does not state any particular remedy. DNW argues that the mode of compensation for changes is specified in paragraph 11.13 of the subcontract, which provides:

> The Subcontractor shall make any and all changes in the Work from the Drawings and Specifications of the Contract documents without invalidating this Subcontract when specifically ordered to do so in writing by the Contractor. The Subcontractor, prior to the commencement of such changed or revised work, shall submit promptly to the Contractor written copies of the cost or credit proposal for such revised Work in a manner consistent with the Contract Documents.

Exhibits 6, 11. Paragraph 11.13 is designed to cover situations where there is "changed or revised work" on written order from the contractor. O'Brien's claim for labor and equipment inefficiency, however, does not encompass such items. The claim compensates for labor and equipment inefficiencies attributable to DNW's delays and interruptions. The trial court did award O'Brien direct claims for plan changes and other extras which conceivably would fall within the terms of paragraph 11.13, but these claims were *exclusive* of the labor and equipment inefficiency award. See revised finding of fact 62. We do not believe that O'Brien's claim for labor and equipment inefficiency is controlled by paragraph 11.13.

Paragraph 11.14 requires the subcontractor to cooperate with the contractor and others whose work might interfere with the subcontractor, and paragraph 11.15 states that the

subcontractor shall cooperate with the contractor in scheduling. There is no evidence that O'Brien failed to comply with these provisions. Furthermore, paragraphs 11.14 and 11.15 do not specify remedies and do not foreclose the relief granted in this case.

■ After reviewing the contractual provisions relied upon by DNW, we are not convinced that any of them specify or require a particular remedy for O'Brien's labor and equipment inefficiency claim. The absence of such a provision distinguishes this case from *Hensel Phelps*, where each of the subcontractor's four claims were specifically addressed under a contract far more elaborate and detailed than the present one. *See Hensel Phelps*, at 176-80.

Where the happening of a condition has been foreseen and a remedy has been provided for its occurrence, the presumption is that the prescribed remedy is the sole remedy. *Donald B. Murphy Contractors, Inc. v. State*, 40 Wn. App. 98, 107, 696 P.2d 1270, *review denied*, 103 Wn.2d 1039 (1985). In this case, however, the contract is silent as to the type of remedy available for O'Brien's labor and equipment inefficiency claim. As such, we fail to see how the quantum meruit relief granted by the lower court in this case is inconsistent with the terms of the contract. The trial court's award of $40,000 in quantum meruit for labor and equipment inefficiency will therefore be affirmed.

ACCORD AND SATISFACTION

DNW asserts that, in the meeting between Whitley, Gribble and Bill and Nancy O'Brien on October 3, 1985, the parties reached a settlement as to all claims O'Brien asserted were outstanding as of that date. DNW contends that an accord and satisfaction was reached because a bona fide dispute existed, the intent to settle all claims was clearly communicated to O'Brien, and O'Brien accepted the settlement terms.

■ The elements of an accord and satisfaction are (1) a debtor tenders payment, (2) on a disputed claim, (3) communicates that the payment is intended as full satisfaction of

the disputed claim, and (4) the creditor accepts the payment. *North Bonneville v. Bencor Corp. of Am.*, 32 Wn. App. 144, 145, 646 P.2d 161 (1982). The party alleging an accord and satisfaction must prove there was a meeting of the minds and that both parties understood that such would be the result. *Gleason v. Metropolitan Mortgage Co.*, 15 Wn. App. 481, 498, 551 P.2d 147, *review denied*, 87 Wn.2d 1011 (1976).

DNW asserts that only the second and third elements of an accord and satisfaction are at issue in this case. We will discuss only the third element as we view it as dispositive. DNW tendered seven checks to O'Brien at the close of the October 3 meeting, and the amount of each check corresponded to an individual invoice from an O'Brien supplier. The "waiver" stamps on the back of the checks provided that the named payees agreed to release rights for labor or material "represented by the invoice". Exhibit 27. As O'Brien testified and the trial court found, the claims represented by the invoices were only those of O'Brien's suppliers, not O'Brien. Thus, there is substantial evidence that DNW did not clearly communicate an intent to settle O'Brien's claims, and O'Brien's acceptance of the checks did not release its claims.

According to DNW, this deal was part of a $57,000 settlement offered by DNW that was accepted by O'Brien. DNW contends that this figure represents $41,000 owed to O'Brien as of October 3, 1985, plus $16,000 to be paid when future punchlist work was completed.

O'Brien acknowledged that such a proposal was discussed. However, O'Brien testified that the only matter resolved at the meeting was the payment of his suppliers, who otherwise intended to file liens against the project. The evidence supports O'Brien's claim, as the parties' conduct after the meeting was inconsistent with a settlement of all disputes.

DNW did not tender $41,000 in checks at the close of the meeting, but only $30,578.30. A month after the alleged settlement, on November 1, 1985, DNW gave O'Brien another

check, made payable to O'Brien supplier Material Distributors, for $13,117.38. In February 1986, DNW gave O'Brien yet another check in the amount of $19,131.11 for sales taxes. Also in that month, the parties submitted to arbitration for amounts O'Brien claimed were owing for disputed punchlist items. That punchlist work, however, had been performed by O'Brien in August and September 1985, *before* the alleged settlement meeting. Had a proposal for settlement of all claims been offered and accepted at the meeting of October 3, 1985, it seems unlikely that these later events would have occurred.

Moreover, in a finding supported by substantial evidence, the trial court concluded that "any offers to settle [the] disputes were never accepted by O'Brien or carried out by Douglas Northwest." Revised finding of fact 95, in part. Even assuming an agreement had been reached, there is no evidence that DNW paid O'Brien $16,000 on completion of future punchlist work, an item allegedly part of the settlement. In fact, DNW refused to obey an arbitrator's ruling that O'Brien was entitled to compensation for previous punchlist work, and refused to arbitrate additional contested items. Even if there had been an accord, DNW failed to perform it, and this gave O'Brien the right to enforce the original obligation. *See Buob v. Feenaughty Mach. Co.*, 191 Wash. 477, 485, 71 P.2d 559 (1937).

### JUDGMENT AGAINST NANCY GRIBBLE

Merton and Nancy Gribble, as husband and wife, were named as third party defendants in this action. Although Merton Gribble denied the existence of a marriage, the trial court found that the Gribbles either were married or had held themselves out as a marital community in Snohomish County. As such, judgment was entered against Merton and Nancy Gribble as husband and wife, along with Whitley and Douglas Northwest, jointly and severally, in the amount of $324,481.17.

DNW argues that judgment against Nancy Gribble jointly and severally must be reversed. DNW contends that there

can be no community liability here because there is no marital community between Merton Gribble and Nancy Gribble. DNW argues that because Nancy Gribble did not sign any documents or otherwise incur any personal liability for the Admiralty Terrace project, there can be no personal judgment against Nancy Gribble.

 While a common law marriage is invalid in this state, evidence of cohabitation and reputation is admissible for the purpose of raising the legal presumption of a prior ceremonial marriage. *Weatherall v. Weatherall*, 56 Wash. 344, 351, 105 P. 822 (1909). The cogency of the presumption is dependent on the facts of each particular case. *Weatherall*, at 351. Among the factors considered are (1) any declarations of the parties concerning their relationship; (2) the manner in which the parties live together; and (3) the opinions of friends, neighbors and acquaintances. *See Weatherall*, at 351.

Merton Gribble admitted that he and Nancy were living together and had at one time been married. He stated that he and Nancy were divorced 30 years ago after getting "mixed up with the church". The separation, Gribble stated, lasted until Nancy quit the church and came back to him about 20 years ago. On a 1987 letter from Merton Gribble to the Snohomish County Department of Public Works, a preprinted return address sticker with the names "Mr. & Mrs. M. H. Gribble" is attached. Exhibit 34. While Merton Gribble admitted to writing the letter, he denied placing the return address sticker on the letter and testified that he did not know how it got there.

Although the evidence as to reputation here is not particularly strong, we feel it is sufficient to support the trial court's finding. The 1987 letter identified Merton and Nancy Gribble as husband and wife. The evidence further indicated that they had shared a continuing relationship for at least 20 years, lived together in the same house and used the same last name. It is undisputed that the Gribbles were married at one time. Although Merton Gribble contended

that he and Nancy were divorced some time ago, no divorce decree or other documentary evidence was ever produced. The trial court's finding that they either were married or held themselves out as such is supported by substantial evidence.

A debt incurred by either spouse during marriage is presumed to be a community debt, *Oil Heat Co. v. Sweeney*, 26 Wn. App. 351, 353, 613 P.2d 169 (1980), and a judgment against a married man is presumptively a community liability. *Whitehead v. Satran*, 37 Wn.2d 724, 225 P.2d 888 (1950). Therefore, to the extent that the judgment in this case imposes liability on Merton Gribble and the community of Merton and Nancy Gribble, it is correct. However, the judgment is erroneous insofar as it imposes personal liability on Nancy Gribble, as there is no evidence to support a personal judgment against her. *See DeLano v. Tennent*, 138 Wash. 39, 47, 244 P. 273, 45 A.L.R. 766 (1926); *Davies v. Carey*, 72 Wash. 537, 542, 130 P. 1137 (1913).

JUDGMENT AGAINST DON WINTON AND
KING WILLIAM ASSOCIATES

Winton contends that judgment against him was improper because the trial court made no findings of fact to support his liability. Winton argues that this creates a presumption that a negative finding has been entered on this issue. Winton contends that there is no statutory or contractual basis for a judgment against him in this case.

In an action to foreclose a mechanic's lien, personal judgment may be rendered against any party personally liable for any debt for which the lien is claimed. RCW 60.04.130; RCW 60.04.180. The right to a personal judgment generally is dependent on a contractual relation being shown between the plaintiff and the defendant against whom the judgment is sought. 53 Am. Jur. 2d *Mechanics' Liens* § 417 (1970). Thus, for a lienor to gain a personal judgment against a property owner in an action to foreclose a lien, some type of contractual relationship between the parties must be established. 53 Am. Jur. 2d, *supra*. Although

personal judgment is proper against an owner or contractor who has promised to pay for work or materials, it is improper as against a subsequent grantee who has made no such promise. 53 Am. Jur. 2d, *supra*.

The trial court in this case made no finding that Winton or King William contracted with or made promises to O'Brien. Winton concedes that the property is subject to the lien, but contends that the entry of personal judgment against him was erroneous. We agree. To the extent that the trial court's judgment imposed personal liability on Winton and King William Associates, it is incorrect.

### PREJUDGMENT INTEREST

Winton argues that the award of prejudgment interest on the following claims was improper because the amounts claimed were not liquidated: (1) extended field work claim; (2) claim for labor and equipment inefficiency; (3) standby equipment claim; (4) soils misrepresentation claim; and (5) claim for placement of select fill.

■ Whether prejudgment interest is awardable depends on whether the claim is a liquidated or readily determinable claim, as opposed to an unliquidated claim. *Hansen v. Rothaus*, 107 Wn.2d 468, 472, 730 P.2d 662 (1986). Damages are said to be "liquidated" when the amount thereof is determinable by a fixed standard, without reliance on opinion or discretion. *Styrk v. Cornerstone Invs., Inc.*, 61 Wn. App. 463, 468, 810 P.2d 1366 (1991). A further definition is that a claim is liquidated " 'where the evidence furnishes data which, if believed, makes it possible to compute the amount with exactness, without reliance on opinion or discretion.' " *Hansen*, at 472 (quoting *Prier v. Refrigeration Eng'g Co.*, 74 Wn.2d 25, 32, 442 P.2d 621 (1968)).

Winton contends that many of O'Brien's claims were not liquidated. The first item disputed by Winton is O'Brien's extended field work claim. O'Brien had requested an award of $14,817.60 for himself and $15,577.76 for his superintendent, James McGovern, based on a formula using hours, wage rate, overhead and profit. The trial court awarded

significantly less than the amounts requested, however, finding that $5,000 each for O'Brien and McGovern was a reasonable sum. Because the trial court necessarily used a measure of discretion in making this determination, the sum was not liquidated. The award of prejudgment interest for these amounts was in error.

The second item contested is the $40,000 quantum meruit award for labor and equipment inefficiency. This is no longer an issue as the trial court, in its revised findings, disallowed prejudgment interest on this claim.

The third item disputed is the $20,525.58 awarded for standby equipment. The trial court awarded O'Brien precisely what he requested on this claim. There was disputed testimony here concerning the proper computation method for deriving hourly equipment rates, with experts for both sides giving their opinions.[13] The trial court was thus forced to rely on opinion testimony, and a measure of discretion was involved. This claim was not liquidated.

Item four involves the award of prejudgment interest on O'Brien's recovery of $20,183.95 for soils misrepresentation. The claim was based on excess manpower and equipment costs, and the amount of the claim was dependent on some of the same opinion testimony as above. O'Brien's expert, Harland McElhany, acknowledged that he had relied on rates provided by Rabern, O'Brien's expert on equipment rates. Again, contrary expert testimony had been presented on the proper method for deriving the equipment rates. This claim was therefore unliquidated.

---

[13]DNW's expert, Nina Gerbic, testified that the proper way in which to derive an hourly equipment rate was to divide the monthly rate by the working hours per month, or 176. Using this method, Gerbic calculated hourly equipment rates and compared them to O'Brien's rates. O'Brien's rates, she testified, were 62 percent higher.

Contrary testimony was presented by O'Brien's expert, Kell Rabern. Rabern testified that the proper equipment rate depended upon the intended and actual usage pattern of the equipment. Rabern stated that the monthly rate is appropriate where equipment is delivered to the site and left there for the entire month, but is not appropriate where there is remobilization or demobilization of the equipment on a weekly or daily basis. Rabern testified that, given the usage patterns on the Admiralty Terrace project, O'Brien's hourly rates were appropriate.

Lastly, Winton challenges the prejudgment interest awarded for plan changes and extra work. The total award was $42,126.04; the amount contested by Winton is that amount attributable to O'Brien's installation of imported backfill and sewer lines in the roadway, $8,155. Establishing this figure required expert testimony; O'Brien conceded that costs for importing material were not covered under the contract. Furthermore, this figure was based on the production levels that the equipment could be reasonably expected to handle, and the amount of the charge depended on the type of equipment used. O'Brien used a scraper for the work, which is nearly three times more expensive than an ordinary dump truck. There was cross examination concerning whether the most cost effective equipment was used. Winton is correct that this claim was not liquidated.

## ATTORNEY'S FEES

The trial court awarded O'Brien attorney's fees of $73,250 and costs of $1,700. DNW contends that the trial court based this award on the lien statute, RCW 60.04.130, and the frivolous claims statute, RCW 4.84.185. DNW asserts that because its position at trial was not frivolous, the court's award of attorney's fees under RCW 4.84.185 must be reversed.

The award of fees in this case is expressly permitted under the terms of RCW 60.04.130. In pertinent part, that statute provides:

> The court may allow to the prevailing party in the action, whether plaintiff or defendant, as part of the costs of the action, the moneys paid for filing or recording the claim, and a reasonable attorney's fee in the superior court, court of appeals, and supreme court.

Under this statute, O'Brien was entitled to recover its attorney's fees and costs at trial. The statute also permits the recovery of costs and attorney's fees to the prevailing party on appeal, and we therefore grant O'Brien's request for such fees. Because the trial court properly awarded attorney's fees under RCW 60.04.130, we decline to address DNW's argument pertaining to RCW 4.84.185.

CONCLUSION

The trial court's judgment is affirmed with the exception of the following: Personal judgment against Nancy Gribble, Don Winton and King William Associates is reversed, and the trial court's award of prejudgment interest on the claims discussed at pages 690-91 is reversed. The judgment in all other respects is affirmed.

Judgment affirmed in part and reversed in part.

PEKELIS and AGID, JJ., concur.

Reconsideration denied February 18, 1992.