[No. 64611-2. En Banc.]
Argued May 28, 1997. Decided December 24, 1997.

THE STATE OF WASHINGTON, *Respondent*, v. HUBERTO ROJO
ARMENTA, ET AL., *Petitioners*.

4

*Robert J. Thompson* and *Johnnie R. Hynson*, for petitioners.

*Andrew K. Miller, Prosecuting Attorney,* and *Stephanie E. Croll, Deputy,* for respondent.

ALEXANDER, J. — Petitioners Huberto Armenta and David Cruz obtained review of a decision of the Court of Appeals that reversed the superior court's dismissal of informations charging each of them with possession of a controlled substance with intent to deliver. The issues before us are whether, under the facts found by the trial court at a suppression hearing, petitioners were detained in violation of their Fourth Amendment rights and, if so, whether that illegal detention vitiated the consent they gave to search their vehicle. We conclude that because petitioners' conduct did not present a reasonable and articulable suspicion that they were engaged in, or about to engage in, criminal activity, they were detained in violation of the Fourth Amendment. We further conclude that their consent to search was a product of this illegal detention. Consequently, we reverse the Court of Appeals and reinstate the order of the trial court dismissing the charges against petitioners.

On October 9, 1994, at approximately 11:00 A.M., petitioners Huberto Armenta and David Cruz approached Prosser Police Officer G.J. Randles at a truck stop in Prosser and

asked him if he knew of an auto mechanic that could repair their car. Randles was in uniform. Although Spanish is their native language, Armenta and Cruz spoke to Officer Randles in English. Randles told Armenta and Cruz that he was not aware of any mechanics who would be available on Sunday, but offered to look at their car himself. Armenta and Cruz accepted his offer and Randles followed them to their car. They mentioned at some point that they were traveling from Idaho to Seattle.

On the way to the vehicle, Officer Randles asked Armenta and Cruz for identification "to tell dispatch where [he was]." Verbatim Report of Proceedings (RP) at 11; *see* Clerk's Papers (CP) at 14.[1] According to Randles, "This was standard operating procedure . . . intended for officer safety." CP at 14. Armenta gave Randles an Arizona driver's license bearing his true name. Cruz told Randles that his name was "Luis Perez," indicating that he had lost his wallet in Idaho and did not currently have any identification on his person.

Officer Randles noticed a bulge in one of Cruz's pockets and, consequently, asked him if it was a wallet. Consistent with his prior statement, Cruz said "no" and took out "[a] wad of money with a $20 bill on top, wrapped with a rubber band." RP at 14. Randles then asked Cruz how much money he had. Cruz said he had $1,000. When Randles asked Cruz where he got the money, he said that he had just cashed a paycheck that he received for working on "a ranch in Seattle." CP at 14-15. Cruz was not, however, able to produce a pay stub and he could not recall the name of the ranch at which he allegedly had been employed. Armenta then voluntarily produced three more bundles of money, each with a $20 bill on top and wrapped with a rubber band, saying that he had three bundles of $1,000 each. When Randles asked Armenta where he got the money, Armenta said that he had just sold a car. Armenta did not, however, have a receipt or a copy of the bill of sale, and he

---

[1]Citations to "CP" refer to the clerk's papers in *State v. Armenta* unless otherwise indicated.

had in his possession the title to the car he claimed to have sold.

At that point, Officer Randles "called in" for a "driver's check" of the names Armenta and Cruz had given him.[2] CP at 15. The dispatcher notified Randles that the car was registered to Armenta, that Armenta's Arizona driver's license had been suspended, and that Armenta had only an identification card in Washington. The dispatcher told Randles that there was no record of a "Luis Perez." Randles then "called dispatch for back-up" and placed the bundles of money in his patrol car "for safe keeping." RP at 15; CP at 16. He asked Armenta if any drugs or weapons were in the vehicle. Armenta said "no." CP at 16. Randles then asked Armenta if he could search the vehicle, saying "something to the effect of 'Do you mind if I take a look? You do not have to let me.' " CP at 16. Armenta said "something to the effect of 'No, go ahead, I don't mind.' " CP at 16. Officer Randles did not read Armenta his *Miranda*[3] rights before asking to search the vehicle.

Randles found a pack of cigarette rolling papers in the vehicle's passenger compartment. As he continued to search, he noticed Cruz standing on the other side of the car holding an open pocket knife with a two-and-a-half- to three-inch-long blade. Officer Randles "asked" Cruz for the knife and conducted a weapons patdown of Armenta and Cruz. CP at 16. Randles then said "something to the effect of 'Do you mind if I take a look in the trunk? You do not have to let me.' " CP at 17. Armenta said "something to the effect of 'No, go ahead, I don't mind.' " CP at 17.

Beneath a spare tire, Randles found a binocular case. Inside it were 50 to 70 clear plastic baggies containing a white powder that he suspected was cocaine. Randles then placed Armenta and Cruz under arrest and transported them to jail. Laboratory tests later determined that the

---

[2]Neither the record nor the trial court's findings indicate whether Officer Randles left Armenta and Cruz in order to do this.

[3]*Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, 10 A.L.R.3D 974 (1966).

binocular case contained approximately 260 grams of cocaine.

Officer Randles later obtained a warrant to search Armenta's vehicle. He found a piece of plastic containing "a black tar substance believed to be heroin." CP at 18. Another officer who assisted in the search "discovered a marijuana cigarette on the vehicle's console."[4] CP at 18.

Detective Suarez of the Tri-City Metro Drug Task Force went to the Benton County jail later that day to interview Armenta and Cruz. Suarez read Armenta and Cruz their "constitutional rights" in Spanish. CP at 18. They each waived their rights and agreed to speak with Suarez.

Cruz told Suarez that he had traveled with Armenta to Parma, Idaho, where Armenta's vehicle had been loaded with cocaine. Cruz said that he and Armenta were being paid $4,000 to drive the cocaine from Parma to Seattle.

Armenta also told Detective Suarez that he and Cruz were receiving $4,000 to drive the cocaine to Seattle. Armenta said that he had gone to Parma with the intent of picking up cocaine and driving it to Seattle, and that he knew the "drugs" were in the vehicle. CP at 19. Armenta acknowledged that he gave Officer Randles permission to search his vehicle.

Armenta and Cruz were charged separately with "possession of a controlled substance . . . with intent to deliver . . . ."[5] CP at 9; Cruz CP at 6. Before trial, they each moved to suppress the cocaine found in the binocular case and the statements they made to Detective Suarez. At a suppression hearing, Armenta testified that he did not understand he could refuse to consent to the search of his vehicle, and that he thought he would not get his money back if he did not consent. He also testified that he had received only a sixth-grade education, in Mexico, and that

---

[4]There is no indication in the record that the items found during the search conducted pursuant to the warrant were found to be controlled substances. In any event, the informations were based solely on the seizure of the cocaine.

[5]RCW 69.50.401(a).

he did not have a bank account. Cruz did not testify at the hearing.

Following the suppression hearing, the trial court entered findings of fact and conclusions of law.[6] Among other things, the trial court concluded:

2. ARMENTA's consent to search his vehicle was freely and voluntarily given under the guidelines set forth in *State v. Shoemaker*, 85 Wn.2d 207, 212, 533 P.2d 123 (1975) and subsequent cases interpreting *Shoemaker*.

. . . .

4. Before a police officer can ask for consent to search a person's car, the police officer must have "articulable facts giving rise to a reasonable suspicion of criminal activity". *State v. Cantrell*, 70 Wn. App. 340, 344 (1993).

5. Officer Randles did not have enough articulable facts to give rise to a reasonable suspicion of criminal activity when he asked ARMENTA for permission to search his vehicle. Thus, the officer did not have the right to ask for consent to search ARMENTA's vehicle.

6. Because the request to search ARMENTA's vehicle was improper, the search itself was illegal. Thus, any evidence discovered as a result of the illegal search must be suppressed.

7. Because the initial search of ARMENTA's vehicle was illegal, the subsequent arrest of ARMENTA and CRUZ was improper. Thus, any statements ARMENTA and CRUZ made after their arrest must be suppressed.

8. Because the initial search of ARMENTA's vehicle was illegal, the subsequent issuance of a search warrant based, in part, on the evidence seized in the illegal search, and the subsequent search of ARMENTA's vehicle incident to the

---

[6]Criminal Rule 3.6 provides:

"At the conclusion of a hearing, upon a motion to suppress physical, oral or identification evidence the trial court shall set forth in writing: (1) the undisputed facts; (2) the disputed facts; (3) the court's findings as to the disputed facts; and (4) the court's reason for the admissibility or inadmissibility of the evidence sought to be suppressed."

search warrant were improper. Thus, the evidence seized pursuant to the search warrant must be suppressed.

CP 20-21.

The State concluded that it was unable to proceed without the suppressed evidence, including the statements of Armenta and Cruz, and thus moved to dismiss the charges against them. The trial court granted its motions and the State appealed to Division Three of the Court of Appeals, which consolidated the appeals pursuant to RAP 3.3. That court reversed the trial court, concluding that although Officer Randles "seized" Armenta and Cruz when he placed their money in his patrol car, he had a "well-founded suspicion" that they were engaged in criminal activity which justified "an investigative stop or seizure." *State v. Armenta*, 83 Wn. App. 118, 122, 920 P.2d 257 (1996), *review granted*, 131 Wn.2d 1005 (1997). We thereafter granted Armenta and Cruz's petition for review.

■ ■ Whether a person has been seized under the Fourth Amendment is a mixed question of law and fact. *State v. Thorn*, 129 Wn.2d 347, 351, 917 P.2d 108 (1996). "The resolution by a trial court of differing accounts of the circumstances surrounding the encounter are factual findings entitled to great deference," but "the ultimate determination of whether those facts constitute a seizure is one of law and is reviewed de novo." *Thorn*, 129 Wn.2d at 351 (footnote and citations omitted). Because Armenta and Cruz have not assigned error to any of the trial court's findings of fact, our review in this case is limited to a de novo determination of whether the trial court derived proper conclusions of law from those findings. *See State v. Hill*, 123 Wn.2d 641, 647, 870 P.2d 313 (1994) ("in reviewing findings of fact entered following a motion to suppress, [this court] will review only those facts to which error has been assigned").

## I.

## SEARCH

■ The parties agree that prior to the time Officer

Randles arrested Armenta and Cruz, they were at some point detained for investigation. An investigative detention constitutes a seizure, and must therefore "be reasonable under the Fourth Amendment."[7] *State v. Kennedy*, 107 Wn.2d 1, 4, 726 P.2d 445 (1986) (citing *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968); *accord State v. Lesnick*, 84 Wn.2d 940, 530 P.2d 243 (1975)). The reasonableness of such a detention depends "on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *United States v. Brignoni-Ponce*, 422 U.S. 873, 878, 95 S. Ct. 2574, 45 L. Ed. 2d 607 (1975) (citations omitted); *accord Brown v. Texas*, 443 U.S. 47, 99 S. Ct. 2637, 61 L. Ed. 2d 357 (1979). A seizure is reasonable if the state can point to "specific and articulable facts giving rise to a reasonable suspicion that the person stopped is, or is about to be, engaged in criminal activity." *State v. Gleason*, 70 Wn. App. 13, 17, 851 P.2d 731 (1993) (citing *Terry*, 392 U.S. at 21-22); *accord United States v. Cortez*, 449 U.S. 411, 417, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981); *State v. Garcia*, 125 Wn.2d 239, 242, 883 P.2d 1369 (1994).

Before determining whether Officer Randles possessed this requisite degree of suspicion, we must first determine at what point Armenta and Cruz were "seized." "Not every encounter between an officer and an individual amounts to a seizure." *State v. Aranguren*, 42 Wn. App. 452, 455, 711 P.2d 1096 (1985). A person is "seized" under the Fourth Amendment only if, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980), *quoted in Aranguren*, 42 Wn. App. at 455; *accord Florida v. Bostick*, 501 U.S. 429, 439, 111 S. Ct.

---

[7]Although Armenta and Cruz mention our state constitution in their briefs, neither have alleged pursuant to *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808, 76 A.L.R.4TH 517 (1986), that we should construe article I, section 7 of the Washington Constitution independently of the Fourth Amendment to the United States Constitution. Consequently, we confine our analysis to the latter. *See State v. Soto-Garcia*, 68 Wn. App. 20, 23 n.1, 841 P.2d 1271 (1992), *abrogated on other grounds by State v. Thorn*, 129 Wn.2d 347 (1996).

2382, 115 L. Ed. 2d 389 (1991) (question is "whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter"). "Whether a reasonable person would believe he was detained depends on the particular, objective facts surrounding the encounter." *State v. Ellwood*, 52 Wn. App. 70, 73, 757 P.2d 547 (1988) (citing *Mendenhall*, 446 U.S. at 554).

■ Cruz contends that he and Armenta were seized when Officer Randles asked them for identification and questioned them on the way to Armenta's vehicle. Br. of Resp't Cruz at 3-4. We do not agree with this assertion. Rather, we endorse the view expressed by the Court of Appeals in *Aranguren* to the effect that "police questioning relating to one's identity, or a request for identification by the police, without more, is unlikely to result in a Fourth Amendment seizure." *Aranguren*, 42 Wn. App. at 455 (citing *Immigration & Naturalization Serv. v. Delgado*, 466 U.S. 210, 104 S. Ct. 1758, 80 L. Ed. 2d 247 (1984)); *see also State v. Ellwood*, 52 Wn. App. 70, 73, 757 P.2d 547 (1988) (because "as a general rule, the approach of a uniformed officer carrying a gun is not in itself a sufficient show of force to instill in one the reasonable belief that he is being detained"; mere fact that detective approached defendant and asked what he was doing and requested his name and date of birth did not "articulate any specific objective facts . . . [that the] stop constituted an illegal detention").

In our judgment, a police officer's conduct in engaging a defendant in conversation in a public place and asking for identification does not, alone, raise the encounter to an investigative detention. We find this reasoning particularly appropriate to the circumstances here, where the police officer requested the identification for some purpose other than investigating criminal activity. It is significant, also, that Armenta and Cruz initiated the contact with Officer Randles, then prolonged it by accepting his offer to assist them with their car. In sum, we are satisfied that Officer Randles's actions in requesting identification from Armenta

and Cruz and conversing with them would not have led a reasonable person in Cruz's position to conclude that he was not free to leave or terminate the contact with Officer Randles. There was, therefore, no seizure at that point.

■ We believe, though, that the Court of Appeals was correct in concluding that a seizure occurred when Officer Randles placed Armenta and Cruz's money in his patrol car.[8] Reasonable persons in their position would have realized at that point that they were not free to leave.

■ ■ Having concluded that Officer Randles seized Armenta and Cruz when he took their money, we must next determine whether he possessed "specific and articulable facts giving rise to a reasonable suspicion" that they were engaged in, or about to engage in, criminal activity. The State asserts that the inconsistent answers Armenta and Cruz gave to Officer Randles's questions, the fact that the two men possessed a significant amount of money, the manner in which they were carrying this money, and their failure to produce identification gave rise to a reasonable suspicion that they were dealing in controlled substances. *See* Br. of Appellant at 9-11. As noted above, the Court of Appeals agreed with this argument. We do not.

*State v. Tijerina*, 61 Wn. App. 626, 811 P.2d 241, *review denied*, 118 Wn.2d 1007 (1991), is instructive. In that case, a state trooper stopped defendant Tijerina's car after it weaved over the fog line on Interstate 90 near Spokane. When Tijerina, who was Hispanic, opened his glove box to retrieve his registration, the trooper noticed "several small bars of soap, the kind commonly given out at motels." *Tijerina*, 61 Wn. App. at 628. The trooper later testified that he was aware of "dozens of investigations monthly in the motels [in the Spokane area] regarding Hispanics selling

---

[8]The trial court concluded that the seizure occurred later, when Randles asked if he could search Armenta's vehicle. *See* CP at 20 (findings of fact 4-6). It is inconsequential whether the seizure occurred then or, as the Court of Appeals determined, when Officer Randles placed the money in his patrol car; in terms of the information available to Officer Randles that could have led to a reasonable suspicion of criminal activity, the seizure of the money and the request to search occurred contemporaneously.

controlled substance[s]." *Tijerina*, 61 Wn. App. at 628. Because Tijerina's license and registration were current, the trooper decided not to issue a citation. Nevertheless, because of his observation of the bars of soap and his knowledge of drug trafficking in Spokane area motels, he asked if he could search the vehicle. Tijerina consented. The search produced several bags of cocaine. Tijerina was arrested and later convicted of possessing a controlled substance. At trial, the trial court denied Tijerina's motion to suppress evidence of the cocaine. The Court of Appeals reversed Tijerina's conviction, concluding that once the trooper decided not to issue a citation, further detention "had to be based on articulable facts from which the [trooper] could reasonably suspect criminal activity." *Tijerina*, 61 Wn. App. at 629. Although the court did not quarrel with the trooper's contention that some Hispanics engaged in drug trafficking in Spokane area motels, it reasoned that the defendant's nationality and his possession of bars of soap were innocuous facts insufficient to justify further investigation. *Tijerina*, 61 Wn. App. at 629.

The instant case is similar. Although Armenta and Cruz, like Tijerina, may have fit Officer Randles's perception of likely drug dealers, they were not doing anything illegal or inherently suspicious when they were seized. It is significant, in our view, that Armenta and Cruz voluntarily approached Randles and were cooperative throughout the course of their contact with him. They were in possession of large amounts of cash, but that fact alone did not justify their seizure. Although it may have seemed to Officer Randles that it was suspicious that Armenta and Cruz were carrying large sums of cash in their pockets, possession of money, like possession of the soap in *Tijerina*, is an innocuous fact. Indeed, the fact that they carried it openly and called it to Randles's attention supports that conclusion.

The fact that Cruz was unable to identify the ranch in Seattle where he allegedly worked may have been cause for a raised eyebrow, but given that English is not Cruz's native language, we do not find that fact particularly signifi-

cant. No doubt there are many seasonal workers in eastern Washington who work for short periods of time for various employers. If they do not speak English well, they may be unable to identify their former employers. Moreover, although it may have seemed odd to Randles that Armenta retained title to the car he allegedly sold, that is not illegal conduct or an indication of illegal activity. The facts here, alone or in total, simply do not lead to a reasonable suspicion of criminal activity.

 ██ Arguably, the most suspicious circumstance is Cruz's giving of a false name. Although, as the dissent points out, Randles testified that Cruz told him he had a Washington identification card, the trial court made no such factual finding and the State has not assailed its failure to do so. In the absence of a finding on a factual issue we must indulge the presumption that the party with the burden of proof failed to sustain their burden on this issue.[9] *Smith v. King*, 106 Wn.2d 443, 451, 722 P.2d 796 (1986); *State v. Cass*, 62 Wn. App. 793, 795, 816 P.2d 57 (1991), *review denied*, 118 Wn.2d 1012 (1992). Because the State had the burden of proof at the suppression hearing, we presume in light of the absence of a finding that Cruz did not make the statement attributed to him by Randles. Therefore, we can say that it was neither surprising, nor suspicious, that a record was not found in Washington under the name that Cruz gave. Thus, Randles could not have known that Cruz gave a false name until long after he placed the money in his patrol car. That fact, therefore, cannot be considered in determining whether the seizure was lawful.

---

[9]The dissent contends that this rule should be ignored on the basis that there is " 'ample evidence to support the missing finding, and the findings entered by the court, viewed as a whole, demonstrate that the absence of the specific finding was not intentional.' " Dissenting op. at 22 n.10 (citations omitted). We disagree. The testimony of Officer Randles does not qualify as ample evidence in light of the fact that the police report and affidavit for search warrant that Officer Randles filled out the day of the arrests do not support his testimony. While the report and affidavit, both of which were admitted as exhibits at the suppression hearing, each mention that Cruz had lost his identification, neither one carries an indication that the lost identification was from Washington. Consequently, it is a stretch to conclude that the trial court omitted the finding unintentionally.

The State argues that once the dispatcher notified Randles that neither Armenta nor Cruz had a valid license, Randles had reason to suspect that they were engaged in, or were about to engage in, the criminal activity of driving without a valid license. Armenta counters that "there should be a nexus between the suspension of the license and something within the vehicle." Br. of Resp't Armenta at 22. *Tijerina* and *State v. Cantrell*, 70 Wn. App. 340, 853 P.2d 479 (1993), *aff'd on other grounds*, 124 Wn.2d 183, 875 P.2d 1208 (1994), support that position. In *Tijerina*, the officer not only suspected the defendant was engaged in an illegal activity, he observed it. Nevertheless, the Court of Appeals concluded that the officer was required to suspect some illegal activity, other than weaving over the fog line, to justify asking for permission to search Tijerina's vehicle: "In evaluating investigative stops, [a] court must determine: (1) Was the initial interference with the suspect's freedom of movement justified at its inception? [and] (2) Was it reasonably related in scope to the circumstances which justified the interference in the first place?" *Tijerina*, 61 Wn. App. at 629 (citing *Terry v. Ohio*, 392 U.S. 1, 19-20, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968); *State v. Williams*, 102 Wn.2d 733, 739, 689 P.2d 1065 (1984)).

In *Cantrell*, a state trooper stopped the defendant for speeding. After issuing a citation, the trooper asked the driver and his passenger if they had any contraband or open containers of alcohol in their vehicle. When they responded that they had some unopened containers of alcohol, the trooper asked if he could search the vehicle. The passenger, whose father owned the car, consented to the search. The trooper discovered some marijuana and a bag of methamphetamine during his search. The driver was then charged with possession of a controlled substance and was convicted following the trial court's denial of his motions to suppress. The Court of Appeals reversed, concluding that "[o]nce the purpose of the stop was fulfilled by issuance of a speeding ticket, . . . the trooper had no right to detain the car's occupants [absent further] articu-

lable facts giving rise to a reasonable suspicion of criminal activity." *Cantrell*, 70 Wn. App. at 344.

We agree with the reasoning of the Court of Appeals in *Tijerina* and *Cantrell* and find it applicable here. Randles did not stand to discover anything regarding the potential driving offense by detaining Armenta and Cruz or searching Armenta's vehicle. Moreover, while driving with a suspended license is admittedly a more serious offense than speeding, *see State v. Reding*, 119 Wn.2d 685, 691, 835 P.2d 1019 (1992) (authorizing custodial arrest for driving with suspended license), Officer Randles did not in fact arrest Armenta, so the search cannot be said to be incidental to an arrest. In our judgment, where, as here, the officer has no hope of discovering information regarding the criminal activity that the officer suspects has occurred or is about to occur, the detention is unreasonable under the Fourth Amendment:

> The purpose of the minimally intrusive *Terry* stop . . . is to allow the police to make an intermediate response to a situation for which there is no probable cause to arrest but which calls for further investigation. As the *Terry* Court noted, a temporary seizure must be "reasonably related in scope to the justification for [its] initiation."
>
> The logical corollary to this is that if, at its inception, there is nothing which reasonably and in good faith can be ascertained during a *Terry* stop, the stop is unreasonable.

*State v. Kennedy*, 107 Wn.2d 1, 17, 726 P.2d 445 (1986) (Dolliver, J., dissenting) (citations omitted). In sum, we find ourselves in agreement with the trial court's conclusion that Officer Randles lacked a reasonable and articulable suspicion that Armenta and Cruz were engaged, or about to engage, in criminal activity, so as to justify placing their money in his patrol car.

## II.

### WAS CONSENT VITIATED BY SEIZURE?

Because Armenta and Cruz did not cross-appeal the trial court's finding that Armenta freely and voluntarily

consented to the search of his vehicle, we do not address that issue. Nevertheless, we must determine whether the prior illegal detention vitiated that consent. Several factors are relevant in determining whether consent to a search is tainted by a prior illegal seizure: "(1) temporal proximity of the illegality and the subsequent consent, (2) the presence of significant intervening circumstances, (3) the purpose and flagrancy of the official misconduct, and (4) the giving of *Miranda* warnings." *State v. Soto-Garcia,* 68 Wn. App. 20, 27, 841 P.2d 1271 (1992) (citing *Taylor v. Alabama,* 457 U.S. 687, 690, 102 S. Ct. 2664, 73 L. Ed. 2d 314 (1982), *abrogated on other grounds by State v. Thorn,* 129 Wn.2d 347 (1996); *accord State v. Gonzales,* 46 Wn. App. 388, 398, 731 P.2d 1101 (1986)).

Here, Armenta consented to the search immediately after Officer Randles placed Armenta and Cruz's money in his patrol car. Furthermore, there were essentially no intervening circumstances, and Armenta and Cruz had not been read their *Miranda* rights. Although we feel certain that Randles was not acting maliciously, it is apparent that he was "fishing" for evidence of illegal drug trafficking. *See, e.g.,* RP at 18 ("Q: [Y]ou had your suspicions and you wanted to get in the car? A[Randles]: If they allowed me to, yes."). In our view, Armenta's consent, although voluntary, was tainted by the prior illegal detention. Likewise, Armenta and Cruz's statements to Detective Suarez were fruit of petitioners' illegal detention. *See Brown v. Illinois,* 422 U.S. 590, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975) (confession following issuance of *Miranda* warnings nevertheless tainted by illegal arrest and therefore inadmissible).

## CONCLUSION

Although Armenta voluntarily consented to the search of his vehicle, there were no "specific and articulable facts" that could have reasonably led Officer Randles to suspect that Armenta and Cruz were engaged, or about to engage, in criminal activity at the time Randles placed their money in his patrol car. Petitioners' consent to the search of their vehicle, because it occurred immediately after the detention and without the benefit of *Miranda* warnings, did not

remove the taint of the prior illegal detention. We reverse the decision of the Court of Appeals and reinstate the order of the trial court dismissing the charges.

DOLLIVER, SMITH, JOHNSON, MADSEN, and SANDERS, JJ., concur.

TALMADGE, J. (dissenting) — The dispositive issue in this case is whether the initial seizure of Armenta and Cruz was lawful under the Fourth Amendment because the trial court found, and the parties on appeal do not dispute, the defendants freely consented to the search of their vehicle. The trial court here determined consent to the search of their vehicle was vitiated by the illegality of their seizure. The majority agrees. I disagree with the majority's analysis of the seizure issue, however, believing it has misconstrued the circumstances of the seizure which justify a *Terry* investigative stop. *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). For these reasons, I respectfully dissent.

Consent to search is a recognized exception to the requirements of the Fourth Amendment. *State v. Hendrickson*, 129 Wn.2d 61, 70-72, 917 P.2d 563 (1996); *State v. Hastings*, 119 Wn.2d 229, 233-34, 830 P.2d 658 (1992); *State v. Bradley*, 105 Wn.2d 898, 902, 719 P.2d 546 (1986). Whether a consent to a search is voluntary is a question of fact to be determined from the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973); *State v. Shoemaker*, 85 Wn.2d 207, 211-12, 533 P.2d 123 (1975). Factors to be considered in evaluating voluntariness may include whether *Miranda* warnings were given prior to consent (*Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, 10 A.L.R.3D 974 (1966)), the education and intelligence of the consenting person, whether the consenting person was advised he or she could refuse to consent, the express or implied authority of the police to search, prior illegal police action, prior cooperation or noncooperation by

the consenting person, or any police deception as to identity or purpose. *State v. McCrorey*, 70 Wn. App. 103, 111-12, 851 P.2d 1234, *review denied*, 122 Wn.2d 1013, 863 P.2d 73 (1993). No one factor is determinative, and neither the *Miranda* warnings nor the knowledge of the right to refuse consent is prerequisite to a voluntary consent. *State v. Smith*, 115 Wn.2d 775, 789, 801 P.2d 975 (1990).

However, if a seizure is unlawful, the result of a consequent search is inadmissible, *State v. Kennedy*, 107 Wn.2d 1, 4, 726 P.2d 445 (1986), and the consent to search may be invalid as well, *State v. Soto-Garcia*, 68 Wn. App. 20, 23-24 and 26-29, 841 P.2d 1271 (1992), *abrogated on other grounds by State v. Thorn*, 129 Wn.2d 347, 351, 917 P.2d 108 (1996). Because the trial court specifically found the consent here to be voluntary, the central issue in this case is the legality of the seizure of Armenta and Cruz.

Initially, there is a question as to *when* Armenta and Cruz were seized. The majority concedes Officer Randles initially came to the assistance of Armenta and Cruz and at some point that assistance ripened into an investigation. The majority determines the defendants were seized when Officer Randles locked their cash up in his vehicle. Majority op. at 12. I agree.

I disagree with the majority, however, that *State v. Tijerina*, 61 Wn. App. 626, 811 P.2d 241, *review denied*, 118 Wn.2d 1007, 822 P.2d 289 (1991), and *State v. Cantrell*, 70 Wn. App. 340, 853 P.2d 479 (1993), *aff'd in part*, 124 Wn.2d 183, 875 P.2d 1208 (1994), are dispositive of this case. In those cases the initial reason for the seizure was a traffic violation. In each case the Court of Appeals held once the traffic-related purpose of the stop was fulfilled, further detention without a reasonable suspicion of criminal activity was improper, tainting any subsequent consent to search and evidence obtained.

In *Tijerina*, an officer observed Tijerina's car weaving over the fog line, stopped him, and, upon verifying Tijerina's drivers license and registration were valid, decided not to issue him a citation. The Court of Appeals determined at

that point the legitimate stop for the traffic infraction ended, and the trooper's continued detention was improper because the bases for that detention were innocuous facts. *Tijerina*, 61 Wn. App. at 629. Because Tijerina's subsequent consent to search the car and the cocaine found in the car's trunk were tainted by the illegal detention, suppression of the evidence was proper. *Id.* at 628.

Likewise in *Cantrell*, a trooper observed Cantrell speeding, stopped him and issued a citation. The Court of Appeals held once the purpose for the stop was fulfilled, absent articulable facts giving rise to a reasonable suspicion of other illegal activity, the trooper's further detention of the car's occupants was improper, invalidating the subsequent consent given to search the car and tainting the evidence obtained. *See Cantrell*, 70 Wn. App. at 344, 346.

Central to the disposition of these cases is the continued *improper* detention which tainted all that followed. Here, however, Officer Randles did not stop Armenta and Cruz for a traffic infraction and then continue to detain them improperly. As noted above, "seizure" of Armenta and Cruz occurred when Officer Randles placed their money in his patrol car. This seizure was valid because the record indicates Officer Randles had a reasonable suspicion of criminal activity based on his knowledge of facts indicating further investigation was appropriate.

The essential basis for investigative stops is set forth in *Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968) (in justifying the particular intrusion [investigative stop] the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion). *See also State v. Kennedy*, 107 Wn.2d 1, 5, 726 P.2d 445 (1986). If a law enforcement officer has a well-founded suspicion a person is engaged in criminal activity, the officer may stop the individual for investigative purposes. *See also State v. Garcia*, 125 Wn.2d 239, 242, 883 P.2d 1369 (1994); *State v. Randall*, 73 Wn. App. 225, 228, 868 P.2d 207 (1994). We have indicated in evaluating the reasonableness of such an investigative stop, the inquiry is whether the totality of the circumstances confronting the law

enforcement officer indicate a substantial possibility criminal conduct has occurred or would occur. *Garcia*, 125 Wn.2d at 242. The policy of Washington law has been to encourage law enforcement officers to investigate suspicious situations. *State v. Mercer*, 45 Wn. App. 769, 775, 727 P.2d 676 (1986). We want law enforcement officers to scrutinize suspected criminal activity.

The majority appears to suggest an investigation must necessarily be linear in its progression; that is, the reasons for the encounter between a citizen and a police officer must ultimately result in the prosecution for the specific type of criminal violation suspected at the time of the initial encounter. This is not the real world. Encounters between citizens and police may be nothing more than that, encounters. Other situations may ripen into investigative stops and, subsequently, actual arrests. Activities on the street do not necessarily follow the logic of ex post facto evaluators in judicial chambers. The preferable test, in my view, for an analysis of the legality of a *Terry* investigative stop remains whether, under the totality of the circumstances, the law enforcement officer has well-founded reasons to believe criminal activity has occurred. If, in the course of this investigative stop, the law enforcement officer discovers other criminal violations, the officer may take appropriate action and is not precluded from so doing, as the majority opinion here would suggest.

In this case, Officer Randles' initial contact with Armenta and Cruz was for an eminently appropriate reason: He offered them assistance with their vehicle. His encounter with Armenta and Cruz, however, ripened into an investigative situation. At the time of the seizure, Officer Randles was faced with numerous suspicious circumstances that would indicate to an experienced police officer criminal activity had occurred or might be occurring. Armenta's license was suspended. Cruz gave a name which could not be verified.[10] Both men were traveling between Idaho and Seattle with large amounts of bundled cash. Cruz said he

---

[10]The majority opines Cruz giving a false name to Officer Randles cannot be considered in determining whether the seizure of the money was lawful because the officer could not have known Cruz had given a false name until long after the

22

officer placed the money in his patrol car. Majority op. at 14. This is not the case. The record indicates Cruz told Officer Randles he had a Washington identification card, but lost it in Idaho. Report of Proceedings at 32. However, when Officer Randles ran the identification check on the name given him by Cruz (Luis Perez Gonzales 12-28-74), no computer record was found. Report of Proceedings at 32, Clerk's Papers at 15 (Finding of Fact No. 11). This occurred *before* Officer Randles placed the money in his patrol car. *See* Clerk's Papers at 15-16 (Findings of Fact Nos. 14-17). At that point Officer Randles knew Cruz was lying about his identity, a fact which significantly colored the other information the officer already had. Together all served as a foundation for his suspicion he had stumbled onto criminal activity warranting further investigation.

I also disagree with the majority's view that we must presume Cruz did not make the statement attributed to him by Officer Randles because the trial court's findings neglect to specifically mention that the identification Cruz purportedly lost in Idaho was a *Washington* identification card. Majority op. at 14. *See also* Clerk's Papers at 14 (Finding of Fact No. 8). In the majority's view, we must treat the absence of such specific finding as the presumptive equivalent of a negative finding. Majority op. at 14.

Such presumption is inappropriate here. While, in general, the absence of an express finding on a material factual issue is presumed to be a negative finding, based on the failure of proof on that issue, *Smith v. King*, 106 Wn.2d 443, 451, 722 P.2d 796 (1986), applying such presumption here would ignore a "well-recognized exception" to the rule:

> This common law rule must be selectively applied. It should not be determinative on a material issue where the record shows . . . there is ample evidence to support the missing finding, and the findings entered by the court, viewed as a whole, demonstrate that the absence of the specific finding was not intentional.

*Douglas NW, Inc. v. Bill O'Brien & Sons Constr., Inc.*, 64 Wn. App. 661, 682, 828 P.2d 565 (1992); *State v. Souza*, 60 Wn. App. 534, 541-43, 805 P.2d 237, *review denied*, 116 Wn.2d 1026, 812 P.2d 103 (1991). Thus, an appellate court may supply a missing finding of fact where there is ample evidence to support the finding and where the remaining findings, viewed as a whole, demonstrate that the trial court's failure to enter the finding was not intentional. Where there is support in the record for such omitted finding and the omission appears unintentional, the failure to make a finding may be harmless error. *Douglas*, 64 Wn. App. at 682; *see also Fisher Properties, Inc. v. Arden-Mayfair, Inc.*, 115 Wn.2d 364, 371, 798 P.2d 799 (1990).

Here, the trial court's findings plainly reflect Cruz's purported assertion to Officer Randles that his lost identification was a Washington identification card. When Officer Randles asked the two men for identification, Armenta produced an Arizona driver's license, Clerk's Papers at 14 (Finding of Fact No. 7), and Cruz gave an alias, stating "he had lost his wallet in Idaho and did not currently have any ID." Clerk's Papers at 14 (Finding of Fact No. 8). Officer Randles then called in the names provided by the men "for a drivers check in Arizona and Washington." Clerk's Papers at 15 (Finding of Fact No. 14). The ID search in Arizona and Washington databases, as reflected in the findings, is consistent with the information Officer Randles had at the time; that is, Armenta had an Arizona ID and Cruz had a Washington ID. Because the record indicates the lost ID was a Washington identification card, *see* Report of Proceedings at 32, and this fact is

earned his money working at a "ranch" in Seattle, the name of which he could not recall. Armenta claimed to have sold a car for which he still had the title and could provide no proof of sale. Given the implausible explanations for the large amounts of cash and the activities of Armenta and Cruz, Officer Randles could reasonably conclude Armenta and Cruz came by the money in a manner they did not wish to reveal and which was probably illegal. In this era of drug-related traffic with large amounts of cash involved in such transactions, it was not unreasonable for Officer Randles to suspect Armenta and Cruz of having engaged in drug-related activities based on the totality of the facts known to him and the rational inferences from those facts. For these reasons, I believe Officer Randles' seizure of Armenta and Cruz was not illegal under *Terry* or *Garcia*, and their consent to search and consequent convictions must stand.

As a final note, counsel for Armenta and Cruz at oral argument suggested the seizure of his clients was the result of racial stereotyping. He argued Officer Randles detained Armenta and Cruz because of their Hispanic heritage and they fit a putative profile for Hispanic drug offenders. There is nothing in the trial court record to suggest this was the basis for Officer Randles' behavior and there was no finding by the trial court to this effect. In my view, however, this was at least implicitly the basis for the decision of the Court of Appeals in *Tijerina*. There, the state trooper testified his suspicions were based on his observations of bars of soap from motels in the glove box of defendant's car, of the fact the defendant and his companion were Hispanic, and of his knowledge of drug activities by Hispanics in motels in the Spokane area. Such racial stereotyping does not constitute a well-founded suspicion of criminal activity by law enforcement and would not in this case, if the trial court had so found.

consistent with the findings as a whole, the failure of the trial court in Finding No. 8 to identify the ID Cruz purportedly lost in Idaho as a *Washington* ID appears to be a mere inadvertence and should not bar our consideration of this fact in assessing the reasonableness of the seizure in this case. *See Douglas*, 64 Wn. App. at 682.

In the absence of findings by the trial court on racial stereotyping, however, we can only look objectively at the record presented to this Court. On the basis of that record, Officer Randles had ample and well-founded suspicion of criminal activity involving Armenta and Cruz. The Court of Appeals should be affirmed.

DURHAM, C.J., and GUY, J., concur with TALMADGE, J.