212 P.3d 573 (2009)
STATE of Washington, Respondent,
v.
Carlos TORRES, Appellant.
Nos. 61616-1-I, 62282-0-I.
Court of Appeals of Washington, Division 1.
July 27, 2009.
*574 David B. Zuckerman, Attorney at Law, Seattle, WA, Carlos Torres (Appearing Pro Se), for Appellant.
Stephen Paul Hobbs, Office of the Prosecuting Attorney, Seattle, WA, for Respondent.

PUBLISHED IN PART
COX, J.
¶ 1 Carlos Torres, a former Washington State Patrol trooper, appeals his conviction for first degree custodial sexual misconduct. The jury instruction defining "being detained" for purposes of the custodial sexual misconduct statute that Torres challenges correctly states the law. "Being detained" for purposes of the law means "restraint on freedom of movement to such a degree that a reasonable person would not have felt free to leave." Moreover, there is sufficient evidence to support the jury's verdict convicting Torres on the charge. Because we also reject the other arguments he makes on appeal, we affirm.
¶ 2 In the early morning hours of June 17, 2005, former Washington State Patrol Trooper Carlos Torres arrested T.G. for DUI after he stopped her vehicle near Fife on Interstate 5. Torres handcuffed T.G. and placed her in the back seat of his patrol car. He advised T.G. of her rights and drove her to the Fife Police Station nearby for a blood alcohol content (BAC) test.
¶ 3 T.G. testified at trial that before leaving for the police station Torres told her she reminded him of someone and that he thought she was beautiful. T.G. was flattered and thought Torres was very nice.
¶ 4 At the police station, the BAC machine malfunctioned and Torres then took T.G. to the Puyallup Tribal Police Department. This drive took approximately 15 minutes.
¶ 5 T.G. testified that during this drive Torres kept talking to her about another girl that she reminded him of, someone he had had a relationship with. He then asked her if he could be blunt. When she agreed, he started asking her questions about oral sex.
¶ 6 T.G. was shocked and scared and started to wonder if Torres was really a state trooper. She testified that it was the most awkward she had ever felt and did not know how to act. He then asked T.G. about her *575 own relationships. T.G. testified that she felt compelled to answer: "I was scared, and I was in the back of a cop car with handcuffs on me. The guy has a gun on him and I . . . just felt that I kind of had to go along with it. I was thinking in my mind that if I just answer his questions I can go home, I can go home and be safe."[1] Torres denied having a conversation during the drive.
¶ 7 When they arrived at the Puyallup station, T.G. provided two breath samples, indicating a blood alcohol level of .055. Torres then transported her to the Pierce County Jail.
¶ 8 On the drive to the jail, Torres again started talking about sex and at one point asked T.G. if she liked oral sex. He also talked about anal sex, his sexual experiences, and the size of his penis. He asked T.G. detailed questions and kept talking about how much he wanted to go see the woman that T.G. reminded him of after his shift. He also asked T.G. whether she had any sexual fantasies and whether women fantasized about having sex with a police officer in a police car.
¶ 9 Because the Pierce County Jail was full, Torres did not book T.G. into the jail. Torres removed the handcuffs from T.G. and released her. He asked where her ride would be coming from to pick her up and T.G. told him Federal Way. Because Torres had to drive north to check the county line, he offered to give T.G. a courtesy ride to the southbound truck scale house to meet her ride. After completing more paperwork related to her release, Torres testified that he let T.G. use his cell phone to call her ride to meet them at the scale house. T.G. testified that she asked Torres if her fiancé could pick her up at the jail, but Torres had her get back into the car and told her he was taking her to Federal Way. T.G. testified that he would not allow her to call her fiancé but that Torres called her fiancé after she gave him the number. T.G. testified that on the drive Torres started talking about sex again. He told her she would be surprised what can happen in the back of a police car and insinuated that he had previously had sex in the building at the Federal Way scales where they were headed.
¶ 10 At about 3:00 a.m. they arrived at the Federal Way scales and Torres parked his vehicle under a light by the scales building. T.G. testified that she could not open the doors or roll down the windows in the back seat of the car. After parking, Torres then began commenting on T.G.'s appearance, telling her she had a great body and nice breasts. He told her to lift her blouse so he could see her breasts, which she did. He then told her he wanted to see her breasts without her bra. She lifted her bra. He then told her he wanted to put his mouth on her nipples. Torres told her to move forward, closer to the partition between the seats, and he turned toward her and moved onto his knees. He touched her breast with his fingers and also put his head through the divider window and put his mouth on her breast. Afterward, he turned back around into a forward position in the front seat and told her he had an erection. He then asked T.G. if she shaved her pubic area and said he wanted to see it. He told her to unbutton her belt and pants, and she complied. Torres told T.G. that he wanted to touch her, at which point he turned back around on his knees, leaned through the window area, and put his hands inside her pants. He put his hand inside T.G.'s underwear, inserted his finger into her vagina, and touched her clitoris. T.G. testified that a car then came into the weigh station and Torres immediately stopped touching her and turned back around in the front seat. After the car left, Torres told her that he had an erection and needed to "relieve himself."
¶ 11 He asked T.G. to go into the building with him, explaining that he could not leave her alone in the car. Because T.G. refused to go into the building, Torres opened the back car door, let T.G. out, and instructed her to stand next to the car while he went into the building. After he returned, it was only a few minutes before T.G.'s ride arrived about 3:30 a.m.
¶ 12 T.G. testified that as soon as she got into the car with her fiancé and daughter that she starting crying and yelling to "get *576 me out of here." Her fiancé could tell something was wrong, but all T.G. told him at that point was that Torres was hitting on her and there was inappropriate conversation.
¶ 13 Over the next few days, T.G. told her fiancé and her brother and his wife about the incident with Torres. T.G.'s sister-in-law reported the incident to the Washington State Patrol. At trial, T.G.'s daughter, fiancé, brother, and sister-in-law testified about T.G.'s emotional state and behavior following the incident.
¶ 14 The State charged Torres with first degree sexual misconduct under RCW 9A.44.160(1)(b). A jury convicted him as charged. Torres appeals.

JURY INSTRUCTION
¶ 15 Torres primarily argues that the trial court's jury instruction defining the level of restraint needed for custodial sexual misconduct incorrectly states the law. Specifically, he claims that the term "being detained" as stated by the statute means "restraint pursuant to a lawful arrest."[2] We disagree. We hold that "being detained" for purposes of the law means "restraint on freedom of movement to such a degree that a reasonable person would not have felt free to leave."
¶ 16 There is neither a WPIC nor a reported case that addresses what the proper law is for purposes of the charge in this case. Accordingly, this is a case of first impression.
¶ 17 "Jury instructions are sufficient if they allow the parties to argue their theories of the case, do not mislead the jury and, when taken as a whole, properly inform the jury of the law to be applied. . . . [A]n instruction's erroneous statement of the applicable law is reversible error where it prejudices a party."[3]
¶ 18 We review a challenged jury instruction de novo, in the context of the instructions as a whole.[4]
¶ 19 For purposes of determining the correct statement of the law for an instruction, our fundamental objective in reading the relevant statute is to ascertain and carry out the legislature's intent.[5] A court should not adopt an interpretation that renders any portion meaningless.[6] We interpret statutes in a manner that best advances the legislative purpose.[7] Strained meanings and absurd results should be avoided.[8]
¶ 20 "When a statute fails to define a term, the term is presumed to have its common law meaning and the Legislature is presumed to know the prior judicial use of the term."[9] The legislature is presumed to know the law in the area in which it is legislating, and statutes will not be construed in derogation of common law absent express legislative intent to change the law.[10]
¶ 21 The meaning of a statute is a question of law that we review de novo.[11]
¶ 22 Here, the State charged Torres under the first degree custodial sexual misconduct statute, RCW 9A.44.160, which provides in relevant part:
(1) A person is guilty of custodial sexual misconduct in the first degree when the person has sexual intercourse with another person: . . . .
(b) When the victim is being detained, under arrest[,] or in the custody of a law *577 enforcement officer and the perpetrator is a law enforcement officer.
(2) Consent of the victim is not a defense to a prosecution under this section.[[12]]
¶ 23 The most natural and straightforward reading of this statute suggests two points. First, the legislature intended that this criminal statute would apply to different types or levels of restraint of a victim. Second, consent of the victim, regardless of the level of restraint, would not be a defense to prosecution. Under the circumstances of this case, the trial court gave the following instruction:
"Being detained by" or "in the custody of a law enforcement officer" means restraint on freedom of movement to such a degree that a reasonable person would not have felt free to leave.[[13]]
¶ 24 The portion of the statute that includes "under arrest" was not at issue in this case. Torres does not claim any error based on the omission of any reference to that portion of the statute in the jury instruction. Likewise, Torres does not argue that the inclusion of a reference to "custody" in this instruction was erroneous. Our focus, therefore, is on the phrase "being detained," a phrase the statute does not define.
¶ 25 In 1997, two years before the legislature enacted this statute, our supreme court discussed the legal meaning of the words "detention" and "seizure" in State v. Armenta.[14] There, the court addressed whether two men were detained by a police officer in violation of their Fourth Amendment rights.[15] Although that case focused on whether the detention was proper, it also discussed the legal definition of a detention (also called a seizure), which is helpful to our analysis here.
¶ 26 The Armenta court recognized that "[n]ot every encounter between an officer and an individual amounts to a seizure."[16] Rather, "[a] person is `seized' [or detained] under the Fourth Amendment only if, `in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'"[17] "`Whether a reasonable person would believe he was detained depends on the particular, objective facts surrounding the encounter.'"[18]
¶ 27 Presumably, at the time that the legislature adopted the custodial sexual misconduct statute, the legislature was aware of the common law definition of "detention" discussed in Armenta. Consequently, we may presume that the legislature intended that the common law definition of "detention" should apply since the legislature did not expressly define the word in the statute. We therefore conclude that the trial court's use of the common law definition of "detained" in the jury instruction defining custodial sexual misconduct in this case was correct.
¶ 28 Torres argues that the term "being detained" should be interpreted to mean "in custody." His argument is not persuasive.
¶ 29 The plain words of the statute make clear that "being detained" is different from either "under arrest" or "in the custody of" for purposes of the statute. To argue that "detained" means "custody" in this context would read "custody" out of the statute. This is a result that we avoid in construing a statute.[19]
*578 ¶ 30 Torres cites to several cases, arguing that they inform our construction of this statute. The cases deal with questions regarding custodial interrogation, consent to a search, or agreement to take a field sobriety test.[20] They are inapposite. The question here is what "being detained" means under this statute, not whether the circumstances here were so coercive as to render consent involuntary. As we have already noted, the first degree custodial sexual misconduct statute specifically makes the victim's consent irrelevant to the crime.[21]
¶ 31 Torres next argues that legislative history supports his argument that "detained by" should be interpreted to mean "in custody." He is wrong.
¶ 32 Although legislative history is not a necessary aid to construe this statute, we note that the legislative history of this statute does not support Torres's argument.[22] Both the Senate Bill Report and House Bill Analysis state that the law would protect "[v]ictims who are detained, under arrest, or in the custody of law enforcement. . . ."[23] This suggests that the legislature contemplated criminalizing three distinct levels of control by correctional and law enforcement officers. While the legislature may have been focused on criminalizing sexual relations between correctional officers and inmates, the reports make it clear that the statute was intended to protect a broader range of victims.[24]
¶ 33 Significantly, neither report indicates that the legislature intended to criminalize only the activity of correctional or law enforcement officers where a victim was in custody for purposes of Miranda.[25] The Senate Bill Report includes the statement "This bill covers law enforcement in an arrest situation."[26] But contrary to Torres's argument, this statement appears to be a description of testimony given in favor of the bill, not a description of the scope of the proposed statute.[27] Finally, we do not agree with Torres's argument that the word "custodial" used in the title of the crime is dispositive here. The specific statutory language at issue is not confined to the title of the crime.
¶ 34 We affirm the judgment and sentence.
¶ 35 The remaining issues in this opinion are not of precedential importance. Accordingly, the remainder of this opinion is not *579 published.[28]
WE CONCUR: AGID and GROSSE, JJ.
NOTES
[1] Report of Proceedings (March 6, 2008) at 647.
[2] Brief of Appellant at 23.
[3] Hue v. Farmboy Spray Co., Inc., 127 Wash.2d 67, 92, 896 P.2d 682 (1995).
[4] State v. Bennett, 161 Wash.2d 303, 307, 165 P.3d 1241 (2007).
[5] See Dep't of Ecology v. Campbell & Gwinn, L.L.C., 146 Wash.2d 1, 9, 43 P.3d 4 (2002).
[6] State v. Keller, 143 Wash.2d 267, 277, 19 P.3d 1030 (2001).
[7] Bennett v. Hardy, 113 Wash.2d 912, 928, 784 P.2d 1258 (1990).
[8] State v. Neher, 112 Wash.2d 347, 351, 771 P.2d 330 (1989).
[9] State v. McKinley, 84 Wash.App. 677, 684, 929 P.2d 1145 (1997).
[10] Wynn v. Earin, 163 Wash.2d 361, 371, 181 P.3d 806 (2008).
[11] Okeson v. City of Seattle, 150 Wash.2d 540, 548-49, 78 P.3d 1279 (2003).
[12] (Emphasis added.)
[13] Clerk's Papers at 69 (Instruction 9).
[14] 134 Wash.2d 1, 948 P.2d 1280 (1997).
[15] Id. at 4, 948 P.2d 1280.
[16] Id. at 10, 948 P.2d 1280.
[17] Id. at 10, 948 P.2d 1280 (quoting United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980), quoted in State v. Crespo Aranguren, 42 Wash.App. 452, 455, 711 P.2d 1096 (1985); accord Florida v. Bostick, 501 U.S. 429, 439, 111 S.Ct. 2382, 2388, 115 L.Ed.2d 389 (1991) (question is "whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter")).
[18] Armenta, 134 Wash.2d at 11, 948 P.2d 1280 (quoting State v. Ellwood, 52 Wash.App. 70, 73, 757 P.2d 547 (1988) (citing Mendenhall, 446 U.S. at 554, 100 S.Ct. 1870)).
[19] See Keller, 143 Wash.2d at 277, 19 P.3d 1030 (statutes must be construed to give all language effect with no portion rendered meaningless or superfluous).
[20] Bostick, 501 U.S. at 439, 111 S.Ct. 2382 (holding consent to a search involuntary where "a reasonable person would [not] feel free to decline the officers' requests or otherwise terminate the encounter"); Berkemer v. McCarty, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) (holding that a traffic stop does not trigger the need for Miranda warnings); Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (requiring Sixth Amendment warnings to protect from coercive pressures of custodial interrogation); State v. Lorenz, 152 Wash.2d 22, 36-37, 93 P.3d 133 (2004) (adopting Berkemer standard regarding custodial interrogations in Washington); Heinemann v. Whitman County, 105 Wash.2d 796, 718 P.2d 789 (1986) (concluding that requesting field sobriety tests during a traffic stop does not subject a suspect to the coercive restraints associated with formal arrest and Miranda warnings are not required).
[21] RCW 9A.44.160(2).
[22] See City of Olympia v. Drebick, 156 Wash.2d 289, 295, 126 P.3d 802 (2006) (Only when the plain, unambiguous meaning cannot be derived through such an inquiry will it be "appropriate [for a reviewing court] to resort to aids to construction, including legislative history.") (citing Campbell & Gwinn, 146 Wash.2d at 12, 43 P.3d 4).
[23] SENATE COMM. ON JUDICIARY, S.B. REP. on Substitute S.B. 5234, at 1, 56th Leg., Reg. Sess. (Wash. 1999); HOUSE COMMITTEE ON CRIMINAL JUSTICE AND CORRECTIONS, H.B. ANALYSIS on Substitute S.B. 5234, at 1, 56th Leg., Reg. Sess. (Wash.1999).
[24] SENATE COMM. ON JUDICIARY, S.B. REP. on Substitute S.B. 5234, at 1, 56th Leg., Reg. Sess. (Wash. 1999).
[25] See Miranda, 384 U.S. 436, 86 S.Ct. 1602 (requiring Sixth Amendment warnings to protect from coercive pressures of custodial interrogation).
[26] SENATE COMM. ON JUDICIARY, S.B. REP. on Substitute S.B. 5234, at 2, 56th Leg., Reg. Sess. (Wash. 1999).
[27] See id.
[28] See RCW 2.06.040.