
FILED
COURT OF APPEALS DIV 1
STATE OF WASHINGTON
2017 MAY 22 AM 11: 21

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | No. 74263-9-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| A.I.,[1] | ) | |
| B.D. 08/21/97, | ) | |
| | ) | |
| Appellant. | ) | FILED: May 22, 2017 |

SCHINDLER, J. — A.I. appeals his conviction in juvenile court of reckless endangerment and malicious mischief in the third degree. A.I. contends the court erred in ruling statements to the police were knowing, intelligent, and voluntary. Because substantial evidence supports the findings and the conclusion that A.I. knowingly, intelligently, and voluntarily waived the right to remain silent, we affirm.

## FACTS

On November 4, 2014, at approximately 11:30 p.m., Alina Cislaru and her boyfriend Constantin Gogu were sitting in the front seat of his Kia Spectra parked in

---

[1] RCW 13.50.050(2) states, "The official juvenile court file of any alleged or proven juvenile offender shall be open to public inspection, unless sealed pursuant to RCW 13.50.260." Because the juvenile court entered an order sealing the juvenile record under RCW 13.50.260, we use initials in the caption and throughout the opinion. See also Gen. Order 2017-1 of Divisions I, II, and III, In Re Changes to Case Title (Wash. Ct. App.), http://www.courts.wa.gov/appellate_trial_courts/?fa=atc.genorders_orddisp&ordnumber=I-021&div=I.

front of her house. Streetlights illuminated the area and the dome light in the car was on.

While talking to Gogu, Cislaru noticed a car drive down the street and then heard "gunshots." The first shots hit the back passenger-side window of the Kia. The glass shattered inside the car. Gogu pulled Cislaru's head down and shielded her with his body "as the guns fired." The second round of gunshots hit but did not shatter the front windshield.

After the shooting stopped and Cislaru heard the car drive away, she lifted her head and saw a red minivan speeding up the hill. Cislaru called 911. Dispatch reported a "red van" "shot windows out of their vehicle."

Approximately two minutes later, Renton Police Officer Randy Jensen saw a red minivan that matched the description of the drive-by shooting. A.I. was sitting in the driver's seat. His older brother I.I. was in the front passenger seat and his older cousin V.L. was in the back passenger seat of the van. Officer Jensen pulled over the van. Renton Police Patrol Sergeant Craig Sjolin and other officers arrived to assist. Officer Jensen's patrol car was equipped with a video recording system and he was "wear[ing] a wireless microphone" on his front breast pocket.

Officer Jensen ordered A.I. to step out of the minivan first and directed him to walk backward with his hands on his head to a grassy area. The patrol car video recorded the following:

> OFFICER JENSEN: Do you want to go ahead and step out of the vehicle, please? Just turn around. Right now you might be the vehicle we're looking for. Go ahead and walk backward to us, okay? Start walking backward to us. . . . Go ahead and keep walking back nice and slow. Keep walking backward. Keep walking backward. Anybody else in your car?

2

Officer Jensen placed A.I. in handcuffs. Sergeant Sjolin read A.I. his Miranda[2] rights. And because A.I. "stated that he was seventeen years old," Sergeant Sjolin also advised A.I. of the juvenile warnings. Meanwhile, Officer Jensen ordered I.I. and V.L. out of the minivan. Sergeant Sjolin placed V.L. under arrest.

Cislaru identified the red minivan as the vehicle that drove by and fired shots at the Kia. The police found two BB[3] guns in the minivan. Several BBs were found in the "[f]ront passenger area where the carpet of the floorboard meets the passenger door frame."

Officer Jensen talked to A.I. Initially, A.I. denied any knowledge about "BB guns or any shooting." But A.I. later admitted he "had been a passenger, shooting out windows, and then switched with the driver." Officer Jensen drove A.I. and I.I. home.

On February 18, 2015, the State charged A.I. in juvenile court with reckless endangerment in violation of RCW 9A.36.050 and malicious mischief in the second degree in violation of RCW 9A.48.080(1)(a). On April 15, the court entered an order extending jurisdiction in juvenile court beyond A.I.'s 18th birthday.

The CrR 3.5 and fact-finding hearing began on August 11, 2015. The defense requested the court hear testimony on whether the statements A.I. made to the police were admissible before hearing testimony in the fact-finding hearing.

> [W]hat I would suggest is that we — we take testimony regarding the [CrR]
> 3.5 [hearing]. Then we take testimony regarding trial issues, and have
> them separate so we don't have to be making different objections.

---

[2] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).
[3] Ball bearing.

Sergeant Sjolin and Officer Jensen were the only witnesses who testified in the CrR 3.5 hearing. The court admitted into evidence the wireless microphone and patrol car recordings. The audio and video systems recorded "some interaction between police" and A.I., I.I., and V.L., including a statement Sergeant Sjolin made to V.L. While placing V.L. in handcuffs, V.L. told Sergeant Sjolin, " '[M]y hand was recently broken, sir,' " and Sergeant Sjolin replied, "[I]t 'might get broken again.' "

Officer Jensen testified that because dispatch reported a drive-by shooting, the police treated the stop as "high-risk" until after placing the occupants of the van in custody.

Officer Jensen testified that after conducting a search of the van, he talked to V.L. Officer Jensen then talked to A.I. while he was in handcuffs seated in the backseat of Officer Jensen's patrol car. Officer Jensen testified that before talking to him, he confirmed A.I. had been informed of his Miranda rights.[4] A.I. speaks Romanian and English.

A.I. told Officer Jensen he was driving and "had no idea what anybody else in the car was doing."

> I remember [A.I.] was the driver. He told me that he was out driving around with his — the other two gentlemen because he was practicing to get his driver's license. I remember initially the gist of our conversation was that he was solely driving, had no idea what anybody else in the car was doing when it pertained to the — the pellet guns and shooting out the windows.

In response, Officer Jensen said V.L. told him the "truth"—that "[y]ou guys were out shooting the BB guns and shooting windows"—and A.I. should not lie about what

---

[4] Officer Jensen testified, in pertinent part:

Q. So, why did you not Mirandize [A.I.]?
A. Another officer had — told me that they had.

happened. A.I. denied using BB guns to shoot at car windows. The patrol car video

recorded the following exchange:

> OFFICER JENSEN: . . . I'm going [to] just talk to you one time. Just like I've already talked to your cousin. All right, I'll — I'll ([un]intelligible) just don't say anything yet. I'm going to ask one time. I already know the answer; I've already got [the] truth out of your cousin. You guys were out shooting the BB guns and shooting windows. Right?
> [A.I.]: No.
> OFFICER JENSEN: No?
> [A.I.]: No.
> OFFICER JENSEN: Nobody was?
> [A.I.]: No.
> OFFICER JENSEN: How come he said that somebody was?
> [A.I.]: I can't, because I — I was driving ([un]intelligible).
> OFFICER JENSEN: Oh, so the other guys did?
> [A.I.]: Uh, I don't know, man.
> OFFICER JENSEN: You don't know?
> [A.I.]: No.
> OFFICER JENSEN: You were just driving and didn't see what was going on?
> [A.I.]: Well, I — I was just driving, and I want to make a license.
> OFFICER JENSEN: You want to make a license?
> [A.I.]: Yes.
> OFFICER JENSEN: I don't understand.
> [A.I.]: I — I want to drive — I was practicing to drive.
> OFFICER JENSEN: Oh, you were practicing driving. Okay. So, you're just out to save your own rear-end right now and let — let your cousins tell us the truth, and be respectful and honest and be a man, but you're going to lie and continue to lie when you even have BB guns and BBs all over the place and you're driving a van just like the people described to us.

At some point after Officer Jensen said the police found BB guns and BBs in the

van, A.I. told Officer Jensen that he "was responsible for everything, and nobody else

was." Officer Jensen did not believe A.I. and urged him to tell the truth.

> So, are — do you want to man up and talk — tell me the truth, or are we done talking? Because it doesn't say "stupid" across my forehead. I've been a cop long enough. I've been an adult long enough. I can read right through lies. If — if we're done talking, then fine, I've got other work I can go do. But, if you want to start owning up to what you guys were doing and start taking responsibility, this is your one opportunity.

5

In response, A.I. asked Officer Jensen, "[I]f I tell the truth. Then what?" Officer Jensen told A.I. that he was not going to make any promises but "if you tell the truth, we'll treat you a lot nicer, we'll work with you."

> Then you tell me the truth, and we go from there. I'm not going [to] make you promises. I'm not going to tell you, oh, if you tell me this and that, I'm going to let you go, because I can't do that. What I'm going to tell you is if you tell the truth, we'll treat you a lot nicer, we'll work with you with what we can because you're trying to man up and be respectful, but that's up to you. I just don't want to waste any more of my breath. I've got a coffee in there that's getting cold. So, if you want to talk to me and tell me the truth, I'm happy to stand here and listen to you. If not, I want to get back to my coffee.

A.I. told Officer Jensen that he used a BB gun and "shot out the window." A.I. said he "had been a passenger, shooting out windows, and then switched with the driver."

Officer Jensen testified he had a "relatively easy conversation" in English with A.I. and A.I. never said he did not understand or requested an interpreter. Officer Jensen testified that A.I. did not express any confusion about the Miranda warnings and never requested an attorney nor indicate that he did not want to talk to Officer Jensen. Officer Jensen testified that he did not hear Sergeant Sjolin say anything to V.L. when he placed V.L. in handcuffs.

> If I heard it, and I thought it was an inappropriate threat to actually harm somebody without cause, I would absolutely report it. Even if it was a sergeant who said it, I would report it to my sergeant or his — our commander.

Sergeant Sjolin testified that A.I. told him that he was 17 years old. Sergeant Sjolin said he read Miranda rights to A.I. from his "officer code book, including the juvenile section." Sergeant Sjolin also testified he "always" gives Miranda warnings to a

6

suspect to ensure the defendant has "a clear understanding of the rights that are afforded them." Sergeant Sjolin testified he and A.I. communicated in English and A.I. did not request an interpreter or an attorney, did not express any confusion about his rights, and stated he understood his rights.

Sergeant Sjolin testified that he did not have an independent recollection of making the statement to V.L. about his hand. But Sergeant Sjolin said he was frustrated and impatient because the "felony stop . . . was not textbook."

Sergeant Sjolin testified that after V.L. made the comment about his hand, Sergeant Sjolin did not "know the context of why" he said, "[L]et's not break it again," but there was a "possibility" V.L. was resisting.

> [T]his gentleman — . . . somebody I took into custody — had made the comment about the — his hand. And I'd said something, well, let's not break it again. . . . I don't know the context of why I said that except to say that it — it's [a] possibility that maybe some — he was being resisted (sic) at the time I was putting the cuffs on. And so, I'm giving a warning about, you know, if you continue to resist, this could go bad.

At the conclusion of the CrR 3.5 testimony, the defense argued the State did not meet its burden of proving A.I. knowingly, intelligently, and voluntarily waived his right to remain silent. The defense attorney argued there was no record that A.I. waived his Miranda rights and the totality of the circumstances showed A.I. was a "[y]oung man" with "limited experience, limited English."

The defense attorney admitted A.I. is "speaking English. He's responding appropriately," but "it's not developed English. I want to make a license is what he first tells the officer. Then they — eventually they understand what that means." The attorney argued that "on a totality of circumstances," the statement Sergeant Sjolin

made to V.L. "certainly could be interpreted as a threat," and then telling A.I. that "they will be nicer to him if he does tell the truth" created a "coercive environment."

> And then later when [Officer] Jensen is talking to him, saying how they will be nicer to him if he does tell the truth. So, we have the — we have the — sort of the — the you cooperate with us, we're going to be nicer to you, having been in a situation where they've got guns drawn on him. One of the individuals is claiming he has a broken arm, and they tell him he might get his arm broken again. It's a coercive environment.

The attorney conceded there was "no conclusive proof" that A.I. heard the comment Sergeant Sjolin made to V.L. about his broken hand but argued there was "a reasonable inference" A.I. heard the comment.

The court addressed the defense argument that the statements were not knowing, intelligent, and voluntary because A.I. was a young man with limited English proficiency and the statements were coerced.

> In this instance [A.I.] contends that his statements were not voluntary for three fundamental reasons. First, the Respondent's youthful age. He was 17 years old at the time that this incident occurred. Second, English is not Respondent's native language. And, third, the statements made to Respondent's cousin [V.L.] were in the nature of a threat and, therefore, coerced [A.I.] to make the statements. The — the threat — the, quote, "threat" should be considered in the context of the Officer later telling [A.I.] that — that they would be a lot nicer if he told the truth.

The court found the testimony of Sergeant Sjolin that he read A.I. his <u>Miranda</u> rights and A.I. had no difficulty understanding his rights credible.

> At the time that [A.I.] was placed in handcuffs, he was in police custody for purposes of [<u>Miranda</u>]. [Sergeant] Sjolin read [A.I.] his [<u>Miranda</u>] rights. He read those rights off of his code book, which included the — and he included the juvenile section. The Sergeant had no difficulty direct — excuse me.
> [Sergeant] Sjolin had no difficulty communicating with [A.I.]; however, he did note a slight accent. [A.I.] indicated that he understood his rights; he did not request an attorney; he did not express any confusion or a need for an interpreter.

8

By contrast, the court did not find Sergeant Sjolin's explanation about the comment made to V.L. credible, "[r]ather[,] the Court does consider the comment to be at best a form of sarcasm and potentially a threat." But the court found there was no evidence A.I. heard the comment Sergeant Sjolin made to V.L.

> However, there was no evidence that Respondent [A.I.] heard the comment made by [Sergeant] Sjolin. Rather the evidence is that the suspects were separated and that [A.I.] was with Officer Jensen, who testified that he did not hear the Sergeant make that comment. In fact, Officer Jensen testified that had he heard a fellow officer or a sergeant make such a comment that was threatening in nature, he would have reported it to a higher authority. Additionally, the Court notes that initially Respondent [A.I.] denied any knowledge of the BB guns or pellets after this threat was allegedly made to his cousin and then later admitted to his involvement in the shootings.

The court rejected the defense argument that Officer Jensen's statement to A.I. that " 'we'll treat you a lot nicer' " was coercive.

> The alleged coercive statement that the police officer would be a lot nicer to [A.I.], strictly in the greater context in which it was made, that is, no promises could be made by the officer and he couldn't release him if he just told the truth, no reasonable person could consider this statement to be coercive in nature.

The court concluded the totality of the circumstances established A.I. knowingly, intelligently, and voluntarily waived his Miranda rights.

> Addressing first [A.I.]'s age, there is no evidence that the Respondent was unable or had difficulty understanding the [Miranda] warnings given to him because of his age, education, or any other mental or physical challenges. In fact, the evidence showed that [A.I.] communicated well with the police officers other than some awkward phraseology such as, quote, "I am going to make a license," end quote, when he intended to say, I am going to get a license. The evidence established that [A.I.] did not express any confusion or misunderstanding about the [Miranda] warnings and was able to communicate with the officers who were able to understand him.
> . . . .
> Here, the totality of the circumstances demonstrates that [A.I.] understood his [Miranda] rights and voluntarily, knowingly, and intelligently

waived them. When the officers first confronted [A.I.], he responded in English to questions asked in English. When the officer advised him of his [Miranda] rights at the scene in English, he responded in English that he understood them. [A.I.] never invoked his rights nor did he ever ask for an interpreter.

The events after [A.I.]'s waiver of his [Miranda] rights further demonstrate his English comprehension. When the officers asked questions in English about the events of that evening, [A.I.] was able to appropriately answer in English. When the officers were discussing his fate in English, [A.I.] was able to understand the trouble he was facing and attempted, in English, to minimize his involvement. There is no indication that [A.I.] did not comprehend English sufficiently to understand what the officers were saying, particularly when they advised him of his [Miranda] rights and obtained his waiver of those rights.

. . . .

For the foregoing reasons this Court concludes that [A.I.]'s statement made to the Renton Police officers of his involvement in shooting BB guns at car windows were made knowingly, intelligently, and voluntarily to law enforcement and are, therefore, admissible.

The court entered lengthy and detailed CrR 3.5 findings of fact and conclusions of law. The written findings of fact and conclusions of law state, "There is no evidence that the respondent was unable or had difficulty understanding the Miranda warnings read to him due to age, education, or any other physical or mental challenges." The court concluded the statements A.I. made to the police "regarding his involvement shooting BB guns at parked cars were made knowingly, intelligently and voluntarily to law enforcement and were therefore admissible."

Officer Jensen, Sergeant Sjolin, and Cislaru testified in the fact-finding hearing. Cislaru testified about the shooting and damage to the cars at her home. Cislaru testified that in addition to the damage to the Kia, her Mazda was parked in the street and damaged. Cislaru said the cost to repair the windows of the Kia and the Mazda was approximately $540. Cislaru also testified that the Volvo and the Mercedes parked in the driveway were damaged.

10

The court found A.I. guilty of reckless endangerment.

Based on this Court's findings of fact, the Court concludes that the State has proved beyond a reasonable doubt that on November 4, 2014, the respondent acted recklessly as he knowingly and intelligently shot BB gun pellets and did further participate with others at shooting BB gun pellets at car windows. A person is guilty of a crime if it is committed by the conduct of another for which he is legally accountable.

But because Cislaru testified that "the Mercedes and the Volvo could not have been shot at the same time as the Kia and the Mazda due to the location of the damage," the court found A.I. guilty of the lesser included crime of malicious mischief in the third degree.

Here, the Court finds that the respondent acted knowingly and intentionally when shooting the BB gun at car windows.

A person acts maliciously when there is evil intent, wish or design to vex, annoy or injure another person. Malice may be inferred in an act done in willful disregard of the rights of another, or an act wrongfully done without just cause or excuse. RCW 9A.04.110. Here, the act of randomly shooting BB guns at car windows is an act done with willful disregard of the rights of others and without just cause or excuse.

The State has proven beyond a reasonable doubt that on November 4, 2014, the respondent caused damage to the property of another, that this act was made knowingly and maliciously and it occurred in King County, Washington. The State has not proved that the respondent caused $750 in damage. Accordingly, the Court finds the respondent guilty of Malicious Mischief in the Third Degree as a lesser included of the crime charged in Count I.

The court entered the order of disposition on November 3, 2015. The court imposed 6 months of supervision and 20 hours of community restitution. The order of restitution required A.I. to pay $586.37 for the damage to the Kia and Mazda. The court scheduled an administrative hearing to seal the juvenile record for May 2016. The court entered an order sealing the record on August 12, 2016.

11

## ANALYSIS

A.I. asserts the court erred in finding that Sergeant Sjolin read him his Miranda rights and the juvenile warnings and that he knowingly, intelligently, and voluntarily waived his rights. "The rule in Washington is that challenged findings entered after a suppression hearing that are supported by substantial evidence are binding, and, where the findings are unchallenged, they are verities on appeal." State v. O'Neill, 148 Wn.2d 564, 571, 62 P.3d 489 (2003). Substantial evidence is evidence sufficient to persuade a fair-minded rational person of the truth of the finding. State v. Hill, 123 Wn.2d 641, 644, 870 P.2d 313 (1994). If the findings are supported by substantial evidence, we review de novo whether the findings of fact support the conclusions of law. State v. Mendez, 137 Wn.2d 208, 214, 970 P.2d 722 (1999); State v. Armenta, 134 Wn.2d 1, 9, 948 P.2d 1280 (1997).

Miranda Warnings

It is well established that before conducting a custodial interrogation, the police must advise a suspect (1) the right to remain silent and provide notice that anything said to the police might be used against him, (2) the right to consult with an attorney prior to answering any questions and have the attorney present for questioning, (3) counsel will be appointed for him if requested, and (4) he can end questioning at any time. Miranda v. Arizona, 384 U.S. 436, 444-45, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). In In re Gault, 387 U.S. 1, 55, 87 S. Ct. 1428, 18 L. Ed. 2d 527 (1967), the United States Supreme Court held the constitutional privilege against self-incrimination under Miranda applies with equal force to juveniles.

Finding of fact 20 states Sergeant Sjolin read A.I. his <u>Miranda</u> rights "from his department issued code book, including the juvenile warnings because the respondent stated that he was seventeen years old." A.I. argues substantial evidence does not support finding of fact 20 because Sergeant Sjolin did not have an independent recollection that he read the warnings to A.I. But without objection, Sergeant Sjolin referred to the police report to refresh his recollection and testify that he read A.I. his <u>Miranda</u> rights and juvenile warnings.[5] <u>See</u> ER 612 (a witness may use a writing to refresh his memory while testifying).

> Q.     And Sergeant [Sjolin], I'm handing you what has been marked State's Exhibit 10.
> A.     Okay.
> Q.     Do you recognize that document?
> A.     Yes. It's a copy of my report.
> Q.     And would looking at that report help refresh your recollection as to [Miranda] that night?
> A.     Yes, it does.

After reviewing his police report, Sergeant Sjolin testified that he read A.I. the standard juvenile <u>Miranda</u> warnings from his officer codebook.

> A.     . . . I talked to [A.I.] at the scene, and I read him [Miranda] warnings from my officer code book, including the juvenile section.
> Q.     Okay. And how did you know to read the juvenile section?
> A.     Well, his date of birth. And I'm not good with math, but I think I note in there that he was 17 years old.
> . . . .
> Q.     Okay. Did you read the [Miranda] warnings in accordance with all your trainings and experience?
> A.     Yes, I did. And it was directly off that notebook. We get it every — it's updated periodically, and it always has the most current aspects with regard to — to [Miranda]. And it's embossed on the back of our laminated officer code books.
> Q.     To your knowledge and — and understanding, is that the standard [Miranda] warnings that are read by everybody in your police department?

---

[5] The record also shows that before questioning A.I., Officer Jensen confirmed A.I. had been given <u>Miranda</u> warnings.

13

A. It is the standard [Miranda] warnings read by all officers in our police department.

Q. Okay. And was — were the juvenile warnings also on that code book?

A. They — they are.

A.I. also argues Sergeant Sjolin's testimony is not credible. A trial court's credibility determination will not be overturned on appeal. State v. Swan, 114 Wn.2d 613, 666, 790 P.2d 610 (1990). Although the court found Sergeant Sjolin's explanation about the comment he made to V.L. not credible, by contrast, the court expressly found Sergeant Sjolin's testimony that he read A.I. his Miranda warnings and rights and that A.I. waived those rights credible.

Waiver

A.I. contends the court erred in concluding he knowingly, intelligently, and voluntarily waived his Miranda rights. Whether a juvenile knowingly and voluntarily waived his Miranda rights is determined by the "totality of the circumstances" surrounding the confession, including the juvenile's age. Fare, Acting Chief Prob. Officer v. Michael C., 442 U.S. 707, 724-25, 99 S. Ct. 2560, 61 L. Ed. 2d 197 (1979); State v. Jones, 95 Wn.2d 616, 625, 628 P.2d 472 (1981). The Court in Fare addressed the totality-of-the-circumstances determination for juveniles.

> [T]he determination whether statements obtained during custodial interrogation are admissible against the accused is to be made upon an inquiry into the totality of the circumstances surrounding the interrogation, to ascertain whether the accused in fact knowingly and voluntarily decided to forgo his rights to remain silent and to have the assistance of counsel. Miranda v. Arizona, 384 U.S., at 475-477.
> . . . The totality approach permits—indeed, it mandates—inquiry into all the circumstances surrounding the interrogation. This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the

warnings given him, the nature of his Fifth Amendment[6] rights, and the consequences of waiving those rights.

Fare, 442 U.S. at 724-25.

The Supreme Court in Fare specifically identifies the "special concerns" that must be considered with juveniles, such as "age and experience." Fare, 442 U.S. at 725.

The Court held:

> There is no reason to assume that . . . juvenile courts, with their special expertise in this area[, ]will be unable to apply the totality-of-the-circumstances analysis so as to take into account those special concerns that are present when young persons, often with limited experience and education and with immature judgment, are involved. Where the age and experience of a juvenile indicate that his request for his probation officer or his parents is, in fact, an invocation of his right to remain silent, the totality approach will allow the court the necessary flexibility to take this into account in making a waiver determination. At the same time, that approach refrains from imposing rigid restraints on police and courts in dealing with an experienced older juvenile with an extensive prior record who knowingly and intelligently waives his Fifth Amendment rights and voluntarily consents to interrogation.

Fare, 442 U.S. at 725-26.

Here, the court addressed the specific concerns that must be considered for a juvenile. The conclusions of law state, in pertinent part:

> The question about whether a person waived their rights under Miranda, must be examined looking at the particular facts and surroundings of each case. North Carolina v. Butler, 441 U.S. 369[, 99 S. Ct. 1755, 60 L. Ed. 2d 286] (1979). In determining whether the confession was voluntary, courts consider the totality of the circumstances surrounding the interrogation. State v. Rupe, 101 Wn.2d 664, 679[, 683 P.2d 571] (1984). Some factors considered by Washington law that go to the totality of the circumstances include the respondent's physical condition, his age, mental abilities, physical experience and police conduct. State v. Aten, 130 Wn.2d[ ]640[, 927 P.2d 210] (1996). Other factors include the crucial element of police coercion, length of interrogation, location of the interrogation, continuity, the respondent's

---

6 U.S. CONST. amend. V.

maturity, physical and mental condition and health and whether the respondent was advised of his rights. State v. Unga, 165 W[n].2d 95[, 196 P.3d 645] (2008). Among the most significant factors that the Courts look at are the police tactics employed, the respondent's mental and physical state and intelligence level. See Rupe. A confession that is the result of police intimidation, coercion or deception is inadmissible. State v. Van[n]oy, 25 W[n].[ ]App. 464[, 610 P.2d 380] (1980).

In this instance, respondent contends that his statements were not voluntary for three fundamental reasons. First, the respondent's youthful age: the respondent was seventeen years old on the date of incident. Second, English is not the respondent's native language. Third, the statements that were made to [V.L.] were threatening in nature, and should be taken in the context of Officer Jensens' [sic] later statement that the respondent would be treated nicer if he told the truth.

A.I. contends the court did not take his age or language barrier into account in determining whether he knowingly, intelligently, and voluntarily waived his right to remain silent. The record does not support his argument. The court concluded neither A.I.'s age nor his "language barrier" prevented him from knowingly, intelligently, and voluntarily waiving his right to remain silent.

Addressing first, the court examines the respondent's age. There is no evidence that the respondent was unable or had difficulty understanding the Miranda warnings read to him due to age, education, or any other physical or mental challenges. In fact, the evidence showed that the respondent conversed well with law enforcement officers other than with some awkward phraseology such as "I am going to make a license" when he intended to say "I am going to get a license." The evidence established that the respondent did not express any confusion or misunderstandings about the [Miranda] warnings and was able to communicate with the officers.

With respect to the language barrier, some of the same analysis applies. Language difficulties encountered by a respondent are considered whether there has been a valid waiver of [Miranda] rights. State v. Teran, 71 W[n].[ ]App. 668[, 862 P.2d 137] (1993) (Court reviews under totality of the circumstances). Here, the totality of the circumstances show that the respondent understood his Miranda rights and voluntarily, knowingly and intelligently waived those rights. When the officers first confronted the respondent, he replied in English to questions asked in English. When he was asked if he understood his Miranda

16

rights, he replied in English that he did understand. The respondent never invoked his rights or requested an interpreter.

The events after the respondent's waiver of Miranda rights further demonstrate his English comprehension. When the officers asked questions in English about the events of that evening, the respondent was able to verbally answer. He was able to discuss his fate, understand the trouble he was facing and attempted, in English, to minimize his involvement. There is no evidence that he did not comprehend English sufficiently to understand what the officers were saying, particularly when the officers read him his rights and when he waived those rights.

Substantial evidence supports the court's findings. The unchallenged findings establish A.I. was 17 years old, Officer Jensen was able to communicate easily with A.I. in English, and at one point, A.I. said he wanted to " 'make a license' " as opposed to " 'obtain' " a license, but otherwise, "all statements were easily understood in English." The audio recording shows A.I. clarified that his use of "make a license" meant he was "practicing to drive" to obtain a driver's license. Officer Jensen and Sergeant Sjolin also testified that A.I. never expressed any confusion about his Miranda rights.

For the first time on appeal, A.I. contends the court erred by failing to analyze under J.D.B. v. North Carolina, 564 U.S. 261, 131 S. Ct. 2394, 180 L. Ed. 2d 310 (2011), whether A.I. acted as a "reasonable child" in evaluating whether he waived his Miranda rights. J.D.B. does not support his argument.

In J.D.B., the Court addressed "the question of whether the age of a child subjected to police questioning is relevant to the custody analysis of Miranda." J.D.B., 564 U.S at 264. The Court held a "reasonable child" standard applies in analyzing whether a 13-year-old child was in custody. J.D.B., 564 U.S at 271-77, 265. The Court held that "so long as the child's age was known to the officer at the time of police questioning, or would have been objectively apparent to a reasonable officer, its

17

inclusion in the custody analysis is consistent with the objective nature of that test." J.D.B., 564 U.S at 277. The Court remanded to consider—but did not define—a reasonable child standard for purposes of the custody analysis. J.D.B., 564 U.S at 281. The Court expressly notes that the issue of whether the child's statements were voluntary was not before it. J.D.B., 564 U.S at 268 n.3.

Coercion

A.I. also contends the statements he made to the police were coerced. A.I. claims the court erred in finding the police followed procedure by separately removing each suspect from the van, the police removed him from the car at gunpoint, and points to Sergeant Sjolin's threat to V.L. Courts apply a totality-of-the-circumstances test to determine if an individual confessed as a product of police coercion. Unga, 165 Wn.2d at 100-01.

Under a totality-of-the-circumstances test, a confession induced by threats or promises that overbear the defendant's will constitutes coercion and must be excluded. Unga, 165 Wn.2d at 101-02. A court considers factors relating to the interrogation itself, including the length, location, and continuity of the interrogation. Unga, 165 Wn.2d at 101. An appellate court reviews a trial court's finding that the confession was voluntary and not coerced for substantial evidence. State v. Broadaway, 133 Wn.2d 118, 133, 942 P.2d 363 (1997).

The record supports finding that the police separately removed each occupant from the van. Findings of fact 9 and 10 state:

9. [A.I.] was ordered out of the van and walked backwards towards police.
10. After the respondent was ordered out of the van, [I.I.] and [V.L.] were taken out of the van one at a time.

18

The record supports finding that Officer Jensen ordered A.I. to "step out of the vehicle" and "walk backward" toward the police officers. After A.I. "came back and was secured," I.I. and V.L. got out of the van at the same time.

> After the first person came back and was secured, he had mentioned that his — I think he said his brother was in the car. So when we went to call out the passenger, two people came out of the vehicle at the same time.

Officer Jensen ordered V.L. to "stay right there" while he took I.I. into custody. Sergeant Sjolin then placed V.L. in custody and handcuffed him.

The record does not support the argument that the police pointed guns at A.I., I.I., or V.L. Below, defense counsel argued, "[W]e got a kid in handcuffs, seeing the guns drawn, if not pointed at him, at least pointed in his general direction." The court ruled there was no evidence a gun was "pointed in his direction."

The court found A.I. did not overhear the statement Sergeant Sjolin made to V.L. Findings of fact 16, 17, and 18 state:

> 16. There is no direct evidence that [A.I.] overheard this statement.
> 17. Officer Jensen did not hear the statement.
> 18. There was testimony that per procedure, the respondent and [I.I] would have already been removed from the area when [V.L.] was brought back.

Substantial evidence supports the court's finding that because A.I. and his brother I.I. "would have already been removed from the area when [V.L.] was brought back," there was no evidence that A.I. "overheard" the statement Sergeant Sjolin made to V.L. Although the audio from Officer Jensen's recording device contains the threat Sergeant Sjolin made to V.L., Officer Jensen testified he did not hear Officer Sjolin "tell [V.L.] that his [hand] might get broken again." Sergeant Sjolin testified he did not yell or

broadcast the comment he made to V.L. Sergeant Sjolin said, "I was just speaking to the person I was dealing with and taking into custody."

For the first time on appeal, A.I. claims Officer Jensen used coercive methods by telling him to "man up" and "tell the truth" and threatening to impound the van. "As a general rule, appellate courts will not consider issues raised for the first time on appeal." State v. McFarland, 127 Wn.2d 322, 332-33, 899 P.2d 1251 (1995); RAP 2.5(a) ("The appellate court may refuse to review any claim of error which was not raised in the trial court."). An appellant waives a suppression issue if he or she failed to move for suppression on the same basis below. State v. Garbaccio, 151 Wn. App. 716, 731, 214 P.3d 168 (2009) ("Because [the defendant]'s present contention was not raised in his suppression motion, and because he did not seek a ruling on this issue from the trial court, we will not consider it for the first time on appeal."). Because A.I. did not seek a ruling on this issue from the trial court, we will not consider it for the first time on appeal. RAP 2.5(a); State v. Mierz, 127 Wn.2d 460, 468, 901 P.2d 286 (1995); State v. Baxter, 68 Wn.2d 416, 422-23, 413 P.2d 638 (1966).[7]

---

[7] Nonetheless, as previously discussed, the record supports finding that based on the totality of the circumstances, the questioning was not coercive. The record also shows Officer Jensen did not threaten to impound the van. The patrol car video recording contains the statement of an unidentified officer saying the police are going to impound the van. But Officer Jensen states that because A.I.'s parents do not have a car to drive "[u]ntil the van gets back," he will do what he can to expedite returning the minivan to A.I.'s parents.

Because substantial evidence supports the court's findings and the determination that A.I. knowingly, intelligently, and voluntarily waived his <u>Miranda</u> rights, we affirm.

WE CONCUR: